IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 19 2025

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

| | |
|---|---|
| K.H. and J.H., <br> Individually, and as Parents <br> of A.H., <br><br> Plaintiffs <br><br> v. <br><br> PULASKI COUNTY SPECIAL <br> SCHOOL DISTRICT, <br><br> Defendant | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

CASE NO. 4:25-CV-00837-BSM

---

## COMPLAINT

---

K.H. and J.H., Individually and as Parents and Next Friends of A.H.,

for their Complaint state:

## I.  SUMMARY OF CLAIMS

1.      Plaintiffs K.H. and J.H. ("Parents") are the parents of A.H., a

child with a disability as defined by the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §1400, *et seq*.

This case assigned to District Judge Miller
and to Magistrate Judge _____

2.      On March 28, 2025, Parents filed with the Arkansas

Department of Education ("ADE") a due process complaint pursuant

to the IDEA seeking to recover from the Pulaski County School

District ("District") the cost of enrollment in a private school (tuition,

fees, and transportation) pursuant to 20 U.S.C. § 1412(a)(10)(C)(ii).

3.      The District argued that A.H. was parentally placed in the

private school, and therefore, Parents did not have a right to the cost

of enrollment in a private school pursuant to 20 U.S.C. § 1412(a)(10)

(C)(ii).

4.      On June 20, 2025, an ADE due process hearing officer ("HO")

agreed with the District's argument and dismissed Parents' due

process complaint for lack of jurisdiction.

5.      Accordingly, Parents seek review of the HO's decision pursuant

to 20 U.S.C. §1415(i)(2)(A). If Parents prevail, they will seek attorneys'

fees and costs pursuant to 20 U.S.C. §1415(i)(3)(B).

## II.  PARTIES

6.     Parents are parties aggrieved by the HO's decision in due

process hearing number H-25-37. *See* 20 U.S.C. §1415(i)(2)(A).

7.     The District is a public corporation that can be sued in its own

name. *See* Ark. Code Ann. §6-13-102(a).

8.     The District is a Local Education Agency ("LEA") as defined by

the IDEA. *See* ADE Spec. Ed. Rules §2.42.[1]

9.     The District is responsible for providing A.H. a free appropriate

public education ("FAPE") as defined by the IDEA. *See* 20 U.S.C.

§1401(9) (definition of FAPE); Ark. Code Ann. §6-41-202(a)(2)

(responsibility for a FAPE assigned to "appropriate school district");

Ark. Code Ann. §6-18-202 (school district based on residency).

### III.  JURISDICTION AND VENUE

10.    The Court has jurisdiction pursuant to 20 U.S.C. §1415(i)(3)(A)

to review the HO's decision in H-25-37. Pursuant to 20 U.S.C.

§1415(i)(2)(C), the Court "(i) shall receive the records of the

administrative proceedings; (ii) shall hear additional evidence at the

---

[1]  Available online: https://dese.ade.arkansas.gov/Offices/special-education/early-childhood-special-education/sections-1-to-30

request of a party; and (iii) basing its decision on the preponderance

of the evidence, shall grant such relief as the court determines is

appropriate." *Id.*

11.    This Court is the proper venue for Parents' claims. *See* 28

U.S.C. §1391(b). The District's principal place of business is located in

Pulaski County, Arkansas. The District's acts and omissions occurred

in Pulaski County. Pulaski County is in the Eastern District of

Arkansas, Central Division. *See* 28 U.S.C. §83(b)(5).

## IV.  CLAIMS

### COUNT I:
### IDEA Review

12.    Attached hereto as **Exhibit A** is a true and correct copy

(redacted) of the HO's decision in favor of Parents in due process

hearing number H-24-48. While the HO in H-24-48 ordered the

District to pay the cost of the private school (including

transportation) through December 31, 2024, **Exhibit A, p. 46**, the

District *by rule* remained obligated after December 31, 2024, to pay

the cost of the private school (including transportation) because the

private school, Compass Academy, became A.H.'s agreed

placement.

13.    The rule, 34 C.F.R. §300.518(d), provides:

If the hearing officer in a due process hearing conducted by
the SEA or a State review official in an administrative appeal
agrees with the child's parents that a change of placement is
appropriate, that placement must be treated as an agreement
between the State and the parents for purposes of paragraph
(a) of this section.

*Id.*

14.    Attached hereto as **Exhibit B** is a true and correct copy of the

HO's decision in H-25-37 wherein the HO erred as a matter law in

finding that "Student was parentally placed at Compass Academy

during the time at issue in this matter between January 1, 2025 to

March 28, 2025," **Exhibit B, p. 3**.

15.    In fact, A.H.'s placement at Compass Academy was an agreed

placement pursuant to 34 C.F.R. §300.518(d).

16.    As an agreed placement, the District remained responsible for

the cost of Compass Academy, including transportation, after

December 31, 2024, until it changed A.H.'s placement by

developing an Individualized Education Program ("IEP") that

changed A.H.'s placement to a District school (or somewhere other

than Compass Academy).

17.    Attached hereto as **Exhibit C** is a true and correct copy of an

Order entered by the District Court for the Eastern District of

Arkansas in another agreed placement case under the IDEA. In that

case, parent prevailed in due process hearing number H-24-01 on

behalf of D.D. and against the Vilonia School District ("Vilonia").

18.    Vilonia appealed the HO's decision in favor of parent. The HO

ordered Vilonia to pay tuition and all costs for Compass Academy for

the 2022-2023 and 2023-2024 school years.

19.    The District Court affirmed the HO's decision finding that

Vilonia agreed to D.D.'s placement at Compass Academy, and as a

result, it remained responsible for the cost of Compass Academy

until it "developed an IEP to move D.D. back to [Vilonia] (or

somewhere other than Compass Academy)." **Exhibit C, p. 37**.

6

20.     The District Court concluded:

The practical upshot of all this would seem to be that [Vilonia] is going to be required to pay for D.D.'s attendance at Compass Academy over the next few years -- including a one-on-one paraprofessional, but not necessarily including transportation costs[2] --  unless and until [Vilonia] develops an IEP that moves D.D. back to the [Vilonia] (or to somewhere other than Compass Academy) and goes through the necessary process of obtaining parental consent or proceeding without parental consent. The latter obviously involves the prospect of an additional administrative process and then maybe more litigation. And, as the Court understands it, D.D. would remain at Compass Academy during the pendency of that additional administrative process and litigation.

**Exhibit C, p. 46**. *See Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985) ("In a case where a court determines that a private placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate, it seems clear beyond cavil that 'appropriate' relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school."); *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 221 (3d Cir. 2017) ("This

_____

[2] The District Court found parent rejected the District's offer of transportation. **Exhibit C, p. 40**.

reimbursement obligation exists not only when the school district and the parents agree that the child should be in private school but also sometimes when they do not. *See generally* 20 U.S.C. § 1412(a)(10)(C). For example, even when parents place a child in a private-school setting to which the school district will not consent, the school district remains liable for the private-school costs if an adjudicator later determines that the private school was the appropriate educational placement for the child."); *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 591 (5th Cir. 2009) ("Accordingly, by force of Supreme Court opinion and federal regulation, the decision by the Texas Education Agency hearing officer on February 10, 2005, was an agreement between HISD and V.P.'s parents that the Parish School was the appropriate placement. The agreement lasts for the pendency of the review of the administrative decision. The regulation does not state that a parent needs to file for a court order declaring the alternative placement to be the correct one. Instead, unless the parents and school district agree otherwise, the Parish School by operation of law is the proper placement.").

21.    Likewise in the present case, the District remained obligated to pay the cost of Complass Academy after December 31, 2024, and until it "developed an IEP to move [A.H.] back to the District (or somewhere other than Compass Academy)." **Exhibit C, p. 37**.

22.    The District failed to develop an IEP to move A.H. back to the District (or somewhere other than Compass Academy) after December 31, 2024. Rather, the District simply refused to pay the cost of Compass Academy after December 31, 2024.

23.    Accordingly, Parents filed Due Process Complaint number H-25-37 to compel the District to continue paying the cost of Compass Academy until it "developed an IEP to move [A.H.] back to the District (or somewhere other than Compass Academy)." **Exhibit C, p. 37**.

24.    The District moved to dismiss Parents' due process Complaint arguing that "Student was parentally placed in the private school and therefore does not have an enforceable right to an [IEP] or

tuition reimbursement pursuant to 20 U.S.C. §1412(a)(10)(C); 34

C.F.R. §300.137(a)." **Exhibit B, p. 2**.

25.     The District further argued that A.H.'s placement at Compass

Academy was *not* an agreed placement because Parents signed an

Educational Freedom Account ("EFA") Waiver Form that

acknowledged:

The State of Arkansas is under no obligation to provide
services or education to the [children listed] except for funding
provided specifically for the Education Freedom Account
Program during the time [Parent] chooses to enroll [his]
children in private school; the resident school district is under
no obligation to provide services or education to the [children
listed] except for services that may or may not be provided to
other private school students as part of the district's regular
obligations under the Individuals with Disabilities Education
Act, 20 U.S.C. §1400 et seq., during the time the parent or
guardian chooses to enroll their children in private school.

**Exhibit B, p. 2**.

26.     Parents argued that they did not knowingly waive their IDEA

rights because the EFA waiver was *not* authorized by the statute

creating EFAs nor ADE's rules implementing that statute. Thus, the

EFA waiver was void *ab initio*.

10

27. The EFA waiver was neither required nor authorized by the

LEARNS Act, Arkansas Children's Educational Freedom Account

Program, Ark. Code Ann. §§ 6-18-2501 to 2511, nor Division of

Elementary and Secondary Education, Rules Governing the

Educational Freedom Account Program (August 10, 2024).

28. It is true that the LEARNS Act (Ark. Code Ann. §6-18-2508(2))

and the EFA program rules (Section 5.03.2) require parents to be

given *notice* that participation in the EFA program is a "parental

placement pursuant to 20 U.S.C. §1412" and "a participating

student ***may*** no longer be entitled to a free appropriate public

education, including special education and related services, from

their public school district of residence, as long as the child remains

in the EFA program." (emphasis supplied).

29.    However, 20 U.S.C. §1412 includes a provision, (a)(10)(C)(ii), by which a school district *may* be required to pay for a parental placement in a private school.

30.    The Court of Appeals for the Eighth Circuit has described this provision as parents' "right of unilateral withdrawal and a right to reimbursement for private tuition." *D. L. by Landon v. St. Louis City Sch. Dist.*, 950 F.3d 1057, 1066 (8th Cir. 2020).

31.    Hence, the qualifier "may" was necessary for the LEARNS Act to be consistent with 20 U.S.C. §1412(a)(10)(C)(ii) creating parents "right of unilateral withdrawal and a right to reimbursement for private tuition." *Id.*

32.    Therefore, the HO erred as a matter of law by interpreting the EFA waiver to deny Parents "right of unilateral withdrawal and a right to reimbursement for private tuition." *Id.*

33. Accordingly, after in independent review of the administrative

record, the Court should rule as a matter of law that the HO erred in

interpreting the EFA waiver as denying Parents their right to

unilateral withdrawal and right to the cost of private school pursuant

to 20 U.S.C. §1412(a)(10)(C)(ii); and, should order the District to

reimburse Parents the cost of A.H.'s enrollment in Compass Academy

after December 31, 2024, and to continue to pay the cost of A.H.'s

enrollment in Compass Academy until it develops an IEP to move

A.H. back to the District (or somewhere other than Compass

Academy). *See* **Exhibit C, p. 37**.

## COUNT II:
### IDEA ATTORNEYS' FEES

34. If Parents prevail in this Court, Parents will be entitled to

recover their attorneys' fees and costs pursuant to 20 U.S.C. §1415(i)

(3)(B), and Parents will file an appropriate motion within 14 days of the Court's Order pursuant to Local Rule 54.1(a).

WHEREFORE, Parents pray that the Court conduct an independent review of the administrative record of due process hearing H-25-37; that the Court rule as a matter of law that the HO erred in interpreting the EFA waiver as denying Parents their right to unilateral withdrawal and right to the cost of private school pursuant to 20 U.S.C. §1412(a)(10)(C)(ii); that the Court order the District to reimburse Parents the cost of A.H.'s enrollment in Compass Academy after December 31, 2024, and to continue to pay the cost of A.H.'s enrollment in Compass Academy until it develops an IEP to move A.H. back to the District (or somewhere other than Compass Academy); that the Court award Parents their attorneys' fees and costs pursuant to 20 U.S.C. §1415(i)(3)(B); and, that Parents be awarded all other appropriate relief.

Respectfully submitted,


Theresa L. Caldwell

Arkansas Bar Number 91163

Clay Fendley

Arkansas Bar Number 92182

Attorney for Plaintiffs


**CALDWELL LAW OFFICE**

14 Alban Lane

Little Rock, Arkansas 72223

Tel.: 501-414-0434

Email: theresa@specedattorney.com

Email: clay@specedattorney.com

Exhibit

## ARKANSAS DEPARTMENT OF EDUCATION
### Special Education Unit

IN RE:

XXXXXXXXXXXXXXXXXXX, Parents of                          **PETITIONER**
XXXXXXXXXXXXXX, Student

VS.                              **CASE NO. H-24-48**

Pulaski Co. Special School District, District                **RESPONDENT**

### HEARING OFFICER'S FINAL DECISION AND ORDER

### ISSUES PRESENTED:

Whether the Pulaski County Special School District (hereinafter "District" or "Respondent") denied XXXXXX (hereinafter "Student") a free, appropriate, public education (hereinafter "FAPE") between January 9, 2024 and May 23, 2024 in violation of certain procedural and substantive requirements of the Individuals with Disabilities in Education Act of 2004, 20 U.S.C. §§ 1400-1485, as amended (hereinafter referred to as "IDEA"), which requires an analysis of the following sub-issues:

(1) whether the District provided Student FAPE in a timely manner by providing appropriate supports and services to address Student's characteristics of Dyslexia, academic deficits in the areas of reading and math, and behavior;

(2) whether the District can prospectively provide Student FAPE; and

(3) whether Compass Academy is an appropriate placement for Student.

### PROCEDURAL HISTORY:

This matter is the second of two hearings between these parties. Parents filed Due Process Complaint H-24–27 on December 21, 2023 and then Due Process Complaint H-24-

Exhibit A

30 on January 8, 2024. Those two cases were consolidated for purposes of the first hearing by the prior Hearing Officer. The prior Hearing Officer issued her Order in consolidated matters H-24-27 and H-24-30 on June 4, 2024 in that matter, with a finding in favor of Petitioners that the District denied FAPE to Student between January 8, 2022, and January 8, 2024. *See* Order in Consolidated H-24-27 and H-24-30 ("Case 1"). The request for private school placement was denied, with no analysis of the issue. The complaint in this matter, H-24-48 ("Case 2"), picks up on January 9, 2024, where Case 1 left off.

On May 23, 2024, Petitioners, the Parents and legal guardians of Student, filed a request for a due process hearing in Case 2 pursuant to the Individuals with Disabilities in Education Act ("IDEA"). The IDEA requires "[a] parent or agency [to] request an impartial due process hearing within two years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint . . ." 20 U.S.C § 1415(f)(3)(c). The State of Arkansas recognizes this same limitations period. *Ark. Dept. of Educ. Special Educ. And Related Services,* 10.00 Mediations and Hearings, § 10.01.4.6(A). The Eighth Circuit Court of Appeals also applies a two-year statute of limitations period under the IDEA. *See In the Matter of Minnetonka v. M.L.K., by and through his Parents, S.K.,* 2021 U.S. Dist. LEXIS 37609, 2021 WL 780723, at *6 (D. Minn. Mar. 1, 2021). "Any claim of a breach falling outside of the IDEA's two-year statute of limitations would be untimely." *Indep. Sch. Dist. No. 283 v. E.M.D.H.,* 960 F.3d 1073, 1083 (8th Cir. 2020). Here, the issues occurring prior to January 9, 2024 were determined by the prior Hearing Officer in her Order in Consolidated H-24-27 and H-24-30. Thus, the time period from January 9, 2024 to May 23, 2024 is at issue in this matter, although the facts from Case 1 are pertinent to some issues of fact and law.

Parents requested the hearing in Case 2 because they believed that District failed to comply with the IDEA, as well as regulations set forth by the Arkansas Department of Education, by failing to provide Student with appropriate supports and services to address Student's deficits in reading, writing and behavioral skills. *See* Petitioners' Complaint in Case 2. In Case 2, Parents seek the remedy of private school placement. *Id.*

In response to Parents' request for hearing, the Department assigned the case to this impartial Hearing Officer who initially scheduled the due process hearing in Case 2 for July 1-3, 2024 with a prehearing conference on June 27, 2024. Parties failed to reach resolution, and there was no resolution conference. See Prehearing Conf. Tr. p. 7-8. Prior to the prehearing conference, Petitioner filed a motion for continuance on June 24, 2024, as the hearing dates conflicted with both Petitioner's and Respondent's attorneys' summer schedules. Respondent did not object to the continuance, and the continuance was granted for good cause shown. Thereafter, September 17-19, 2024 was set as the date on which a hearing would commence. Prior to the prehearing conference scheduled for September 16, 2024, Petitioner filed a request for continuance on September 3, 2024 requesting that the hearing schedule be continued/adjusted to September 18, 19 and 24, 2024 due to scheduling in another matter in federal court. Respondent did not object and was available on September 24, 2024, and the continuance was granted for good cause.

Having been given jurisdiction and authority to conduct the hearing pursuant to Public Law 108-446, as amended, and Arkansas Code Annotated §§ 6-41-202 through 6-41-223, Debby Linton Ferguson, J.D., Hearing Officer for the Arkansas Department of Education, conducted a closed impartial hearing. This Hearing Officer ruled that Parents had the burden of proof, and Parents non-IDEA federal claims were dismissed without

prejudice. See Case 2 Tr. Vol. I p. 6-7, Case 2 Prehearing Tr. p. 18-19. 1 The parties agreed to incorporate the administrative record from Case 1 (H-24-27 and H-24-30) into the record for Case 2 (H-24-48). Id. at p. 15; Case 2 Tr. Vol. I p. 6-7. The hearing began as scheduled, and testimony was heard on September 18-19, 2024.   Parents were represented by Theresa Caldwell and District was represented by Jay Bequette. Also, present for the hearing were XXXXX ("Mother"), XXXXX ("Father") (together "Parents"), XXXXX (Student's grandfather), Audie Alumbaugh ("Parent Advocate"), Stephanie Cole ("LEA"). The following witnesses testified in this matter: LEA, Superintendent, Ellen Morris ("Special Education Teacher"), Ruby Blanton ("General Ed. Teacher"), Michele Pickett ("Principal"), Ebony Keaton ("School Behavior Specialist"), Courtney Williams ("Compass Director") and each of the Parents.  After two days of testimony, it appeared that two additional days would be required to complete the hearing, and the parties agreed to continue the hearing to the two consecutive dates of October 23 and 24, 2024, in lieu of September 24, 2024. However, the hearing concluded on October 23, 24.  Both parties were offered the opportunity to provide post-hearing briefs in lieu of closing statements, and both parties submitted a timely brief for consideration.

### FINDINGS OF FACT:

In the role of factfinders, special education hearing officers are charged with the responsibility of making credibility determinations of the witnesses who testify. *Independent Sch. Dist. No. 283 v. S.D. ex rel. J.D.,* 88 F.3d 556, 561 (8th Cir. 1996); *Parrish v.*

---

[1] Case 1 P. Ex. means Consolidated H-24-27 and H-24-30 Parent exhibit, Case 1 D. Ex. means Consolidated H-24-27 and H-24-30 District exhibit, and Case 1 Tr. means Consolidated H-24-27 and H-24-30 transcript volume.  Case 2 P. Ex. means H-24-48 Parent exhibit, Case 2 D. Ex. means H-24-48 District exhibit, and Case 2 Tr. means H-24-48 transcript volume.

*Bentonville Sch. Dist.*, No. 5:15-CV-05083, at *8 (W.D. Ark. March 22, 2017). This Hearing Officer found each of the witnesses who testified to be credible in that they all testified to the facts to the best of their recollection; minor discrepancies in the testimony were not deemed to be intentionally deceptive. Any inconsistencies were minor and did not play a role in this hearing officer's decisions. The weight accorded the testimony, however, is not the same as credibility. Some evidence, including testimony, was more persuasive and reliable concerning the issues to be decided.

The findings of fact were made as necessary to resolve the issues; therefore, not all of the testimony and exhibits were explicitly cited. In reviewing the record, the testimony of all witnesses, and each admitted exhibit's content were thoroughly considered in issuing this decision, as were the parties' post hearing briefs.

## I. FINDINGS OF FACT FROM THE PERIOD OF CONSOLIDATED H-24-27/H-24-30

### A. Background

At the time of the Complaint in Case 1, Student was a nine-year-old male in the third grade, had been enrolled at District in Robinson Elementary School since kindergarten. Student suffered from extreme neglect until he was adopted (along with his sister) by Parents when he was less than two years old. Case 1 Tr. Vol. III p. 57. At age four, Student was diagnosed with attention deficit hyperactivity disorder ("ADHD") and Unspecified Disruptive, Impulsive-Control, and Conduct Disorder. Case 1 P. Ex. p. 407. Student was also evaluated for occupational therapy services by The Allen School, a school for the treatment of children with intellectual and developmental disabilities, and determined to need only consultative occupational therapy services. Case 1 P. Ex. p. 481-484. Student attended preschool at The Allen School for two years, then enrolled in kindergarten at District. Case 1

Tr. Vol. III p. 58-59. Father testified that, at that time, Student was "very intelligent" but his social skills were an issue, although not "severely pronounced," he had sensory issues (for example, things that touched him, loud noises, lots of activity), was somewhat oppositional, and sucked his thumb. Case 1 Tr. Vol. III p. 59-61. Nonetheless, Student did well in pre-kindergarten, kindergarten, and first grade, according to Father. Case 1 Tr. Vol. III p. 59-62.

Student was first referred for special education in kindergarten on September 17, 2020, and District determined that he was eligible for special education services on December 18, 2020. Case 1 P. Ex. p. 302. The evaluation conducted by District noted that Student had below average cognitive ability and "a wide range of academic scores." Case 1 D. Ex. p. 17, 22. The evaluation also noted reading comprehension and math as strengths, but stated that Student showed weaknesses in "basic reading skills, math calculation skills, and writing skills, including spelling." Case 1 D. Ex., p. 22. The evaluator recommended special education eligibility under Other Health Impairment ("OHI") based on the evaluation and his diagnoses at that time of ADHD and Unspecified Disruptive, Impulse-Control, and Conduct Disorder. Id. at p. 23. District identifies Student's initial eligibility determination date as December 18, 2020. Id. at p. 27-28. As Student's eligibility date falls in December, his IEPs are reviewed in the middle of each school year, covering the last half of one school year and the first half of the next.

**B. 2021-2022 School Year (7/1/21 to 6/30/22) – First Grade**

Father testified that in first grade, Student exhibited more "push back when given a directive." Case 1 Tr. Vol. III p. 62. On October 27, 2021, Student's IEP team met to consider the need for a functional behavioral assessment ("FBA"). Case 1 P. Ex. p. 299. The team noted that Parents were considering seeking an evaluation for Autism from the UAMS Dennis

Developmental Center ("DDC"), but due to the waiting period District would consider a crisis/safety plan for Student. Case 1 P. Ex. p. 299-300.

Student's IEP for the period of 12/16/21 to 12/16/22 (mid-first grade to mid-second grade) (Case 1 P. Ex. p. 346-355), provided special education services of 30 minutes each per day of direct instruction in literacy and math, and related services of 60 minutes per month for occupational therapy consultation. Case 1 P. Ex. p. 351. The IEP also provides multiple accommodations for Student (Id. at p. 350), strategies for behavior management (Id. at p. 349), one goal for literacy, and one goal for math (Id. at p. 352).

The IEP team met on January 13, 2022 to discuss Student's classroom behavior, and develop a behavior management plan. See Case 1 P. Ex. p. 337-341. Then, on March 8, 2022, the IEP team met to create a Crisis Plan to address Student's elopement tendencies. Case 1 P. Ex. p. 346, 365-367. The IEP team also sought parental consent for an assessment to determine whether Student needed a one-on-one paraprofessional. Case 1 P. Ex., p. 346, 368.

## C. 2022-2023 School Year (7/1/22 to 6/30/23) – Second Grade

### 1. School-based Mental Health Services.

During the second grade, Student began receiving school-based mental health services from Youth Home, provided by Ann Smith. Case 1 Tr. Vol. I p. 161. Special Education Teacher testified that the school-based mental health services were privately funded and were not provided through Student's IEP. Id. Special Education Teacher testified that she had invited Ann Smith to Student's IEP meetings. Id. at p. 164. Principal testified that Ann Smith met with Student weekly and had a "good rapport" with Student. Case 1 Tr. Vol. II p. 124-125. District would call on her at times for her assistance during behavioral problems and her office was one of Student's "safe places." Id.

**2. Dyslexia Diagnosis and Services.**

Second grade marked the initiation of District providing dyslexia intervention services to Student. Case 1 Tr. Vol. I p. 17. At that time, his Lexile score was at a beginning reader level. Id. Morris testified Student had handwriting and written expression deficits also. Id. at p. 23, 76. On November 30, 2022, a Level 1 Dyslexia Screener was administered to Student, with the results showing that Student was considerably below expected level in decoding, word recognition, fluency rate, spelling/encoding, written expression, and comprehension. Case 1 P. Ex. p. 573. Parent consented to a Level 2 Dyslexia Screening, and on January 5, 2023, Parents provided consent for District to begin providing services in the Dyslexia Program. Case 1 P. Ex., p. 571. Principal testified that Student began receiving dyslexia services on March 2, 2023. Case 1 Tr. Vol. II p. 144. Dyslexia services were not part of Student's IEP, because, as Pickett explained, "In Pulaski County, because we diagnose characteristics of dyslexia, it is part of the general education." Case 1 Tr. Vol. II p. 178.

According to the testimony of several witnesses, Student was exposed to at least three different reading programs:

• Special Education Teacher used Phonics First, a phonics curriculum approved by the Department as a dyslexia curriculum. She chose Phonics First because it had a strategic and systematic, multi-sensory approach that she believed would be beneficial for her students with reading fluency issues (Case 1 Tr. Vol. I p. 93-94);

• Blanton, Student's Regular Education Teacher, used the District's Benchmark curriculum for reading (Case 1 Tr. Vol. II p. 95); and

• The "dyslexia person" used the Sonday System to deliver dyslexia intervention services to Student (Case 1 Tr. Vol. II p. 95).

RaDiah Reynolds, a Certified Academic Language Therapist ("CALT") and speech-language pathologist, testified as an expert witness for Parents. Case 1 Tr. Vol. III, p. 104. Ms. Reynolds worked in dyslexia intervention since 2018 and has been a speech-language pathologist since 2010. Id. When Reynolds was asked whether using multiple reading programs could pose a problem for Student, given his characteristics of Autism and clear difficulties with reading comprehension and written expression, she replied that it would be very confusing for a student with a language disorder. Case 1 Tr. Vol. III p. 152. However, it is not uncommon for educators to pull from different reading programs to address a student's individualized needs. Case 1 Tr. Vol. III p. 150. She also pointed out that she did not see much progress in Student's dyslexia worksheets that she reviewed from Parents exhibits. Case 1 Tr. Vol. III p. 142.

### 3. 12/9/22, IEP Annual Review.

District conducted the annual review of Student's IEP on December 9, 2022, of his second-grade year. Case 1 P. Ex. p. 220-230.

### 4. April 12 and 18, 2023 Incidents.

Student was suspended from school on April 13, 2023 and April 20, 2022 (Case 1 D. Ex. p. 224, 668, 670-671), for the following behavioral incidents described on the subsequent Manifestation Determination Review ("MDR"):

• April 12, 2023, [Student] pushed a student so hard that the student crushed his glasses against a pole and he also tried to run away from the school campus after this incident and security had to run after him to make sure he was safe. Id.

• April 18, 2023, right before NWEA testing Ms. Sinh and Mrs. Willmuth tried to get [Student] to get off his laptop to get into the NWEA test and got mad because he had to get

off his game. He told the teachers to "get out of my business!" and "get away from me." Id. After Mrs. Willmuth took his laptop away, he ran out of the classroom and the school building. Ms. Sinh chased after him to make sure he did not run into Highway 10. Case 1 D. Ex. p. 224.

### 5. May 1, 2023, IEP Team Meeting.

The IEP team met on May 1, 2023, to review Student's IEP in light of his recent behavioral incidents and discipline. Case 1 P. Ex. p. 241-250. The IEP team amended the IEP by adding strategies for behavior management, and amended Student's behavior plan and crisis safety plan. Case 1 P. Ex. p. 257.

### 6. May 2, 2023, PBIS Major Referral; OSS.

On May 2, 2023, Student was involved in a behavioral incident primarily over attempts to have him stop using his computer. Case 1 D. Ex. p. 173-176. Student was screaming and yelling at his teachers, eventually kicking and knocking over items in the library. Id. After trying to elope, Student hit and kicked the School Resource Officer, and threatened to kill him and the behavior specialist who was assisting. Id. The officer handcuffed Student to a chair, and Student continued the behaviors. Id. Mother was called to the school. Id. Student received a five-day out of school suspension ("OSS"), but was allowed to return to school one day early, because "[District] recognizes the importance of being in school." Case 1 D. Ex. p. 174-176.

### 7. May 4, 2023, Dennis Development Center Evaluation.

Student was evaluated for possible Autism by the UAMS Dennis Development Center ("DDC") on May 4, 2023. See Case 1 P. Ex., p. 400-422. As a result of the evaluation, DDC diagnosed Student with "Autism Spectrum Disorder, without accompanying basic language

impairment, without accompanying intellectual impairment, and requiring level 1 support in the area of social communication and level 2 support in the area of restricted, repetitive behaviors." Id. at p. 405-406, 417. The DDC report recommends that Student "be considered for placement into speech-language therapy services through the local school district to address deficits in social/pragmatic language skills," and considered for "direct occupational therapy services ... given his difficulties in the school setting," particularly to "address sensory processing issues [and] difficulty with handwriting." (emphasis added) Id. p. 405, 417. Mother testified that District advised her that based on those evaluations, "the pragmatic speech and OT therapy were not necessary for learning in school, that was like a life skill, not at school." Case 1 Tr. Vol. IV p. 65.

**8. May 8, 2023, IEP Team Meeting.**

The IEP team met again on May 8, 2023, for the purpose of discussing Student's May 2 behavior incident and the need to update his IEP, behavior plan, and crisis plan. Case 1 P. Ex. p. 224-225, 266. The team added 30 minutes per day of social skills direct instruction, and "brainstormed ideas" on updates to the behavior plan and crisis plan. Id. Parents advised the IEP team at that meeting that Student was evaluated by the DDC for possible Autism on May 4, 2023, but did not yet have the DDC report. Id. The IEP team amended the IEP (Case 1 D. Ex. p. 213), amended Student's Behavior Management Plan (Case 1 D. Ex. p. 235-240), and completed a form entitled Functional Assessment Analysis of Problem Behavior (Case 1 D. Ex. p. 224-233). Special Education Teacher admitted this is not an FBA but is form that is part of the behavior analysis done for the MDR. Case 2 Tr. Vol. I p. 72-73.

**9. May 8, 2023, MDR.**

The IEP team also conducted an MDR of Student's May 2 behavior incident on May 8,

2023, which resulted in a five-day suspension. Case 1 D. Ex. p. 224-225. However, there are no days of suspension shown in Student's attendance record. Case 1 D. Ex. p. 671.

### 10. Receipt of DDC Evaluation Report.

Parents provided a copy of the DDC report to District on or about the last day of school. Case 1 Tr. Vol. IV p. 64. A copy of the report bearing a date stamp of June 7, 2023, appears at Case 1 D. Ex. p. 179. The DDC report confirmed that Student was diagnosed with Autism without accompanying impairment of basic language skills and without intellectual impairment, and the DDC recommended the maximum time allowed in all areas of therapy recommended, including ABA therapy, behavioral counseling, speech therapy for pragmatic language/social skills, and occupational therapy to address Student's fine motor skills deficits and sensory issues. Case 1 D. Ex. p. 181-182; Case 2 Tr. Vol. I p. 43. The DDC report also documented that Student was carrying a stuffed character on the date of the evaluation. Case 2 P. Ex. p. 214.

## D. 2023-2024 School Year (7/1/23 to 1/8/24) – Third Grade

### 1. July 12, 2023, IEP Team Meeting.

On July 12, 2023, the IEP Team met, by video conferencing, to review the DDC evaluation that provided a new diagnosis of Autism. See Case 1 P. Ex. p. 1-15, 17-18. The IEP team for this meeting consisted of Parents and two persons from the District -- Melissa Kilpatrick, serving in the roles of special education teacher, general education teacher, and LEA representative, and Rebecca Smith, the individual there to interpret evaluation results. Case 1 P. Ex. p. 10, 17-18.

Although Parents had provided a copy of the full DDC evaluation to District, the IEP team told Parents at the meeting that they did not have a copy; Parents emailed a copy to

District during the meeting. Case 1 Tr. Vol. IV p. 64. As a result of the new diagnosis, the team approved new evaluations for achievement, executive function, behavior, and sensory processing. Case 2 P. Ex. p. 17. The team amended the IEP to add a new behavior goal and revised Student's accommodations. Id. at p. 1-17. Student was in general education 86% of the time, although it was noted that small group instruction was necessary for Student to acquire skills specified in the IEP, behavior intervention strategies established in the child's IEP require a degree of structure that cannot be implemented in a large group setting, and child's behavior significantly impeded his or her learning and that of others, and additional individualized instruction is needed to facilitate learning. Case 2 P. Ex. p. 1, 8, 17.

**2. Evaluations.**

**(a) 9/14/23 Specialized Reevaluation.**

As approved in the July 12, 2023 IEP meeting, the specialized reevaluation was conducted by Rebecca Smith, M.S., District's licensed school psychology specialist on September 14, 2023. Case 2 P. Ex. p. 17; Case 1 P. Ex. p. 372-399. The report recommends that Student "meets eligibility criteria for special education services under the IDEA category of Autism." Id. at p. 392. Conclusions from the evaluation included:

- ... multiple characteristics of his ASD diagnosis affecting his acquisition of educational objectives as well as socially.

- ...significant adaptive skills deficits in Communication, Functional Academics, and Social areas...

- [BASC-3 adaptive scores] At-Risk and/or Clinically Significant score [both school and home settings] in ... Aggression, Conduct Problems, Depression, Attention Problems, Atypicality, Adaptability, Leadership, Anger Control, Bullying, Emotional Self-Control,

Executive Functioning, Negative Emotionality, Resiliency, ADHD Probability, Autism Probability, Emotional Disturbance Probability, and Functional Impairment...

• [BRIEF-2 Scores (teacher form)] ... Clinically Elevated ratings in the areas of Inhibit, Self-Monitor, Shift, Emotional Control, and Working Memory with Potentially Clinically Elevated scores in Initiate, Plan/Organize, and Organization of Materials ...

• [KTEA-3 academic skills] ... below average abilities in basic reading skills, reading comprehension, math problem solving, math calculation, and silent reading fluency, and word recognition fluency ... [and] significant deficits in written expression and decoding abilities. Id.

**(b) 9/8/23 Occupational Therapy Initial Evaluation.**

Also, as approved at the July 12, 2023 IEP meeting, an occupational therapy initial evaluation was completed. Case 2 P. Ex. p. 17. The occupational therapy initial evaluation was conducted on September 8, 2023, by Missy Shipman, an occupational therapist employed by District. Case 1 Tr. Vol. IV p. 112. Shipman has a master's degree from the occupational therapy program at the University of Central Arkansas. Id. In her report dated October 2, 2023, Shipman concluded that consultative occupational therapy services would be sufficient for Student stating: "[Student]'s delays in executive functioning skills, social skills, and sensory sensitivity and avoidance do affect his ability to participate in grade level activities ... [but] can be adequately addressed through consultative occupational therapy services ... [of] 15 minutes ... each week." Case 1 D. Ex. p. 273.

Shipman's conclusion was strongly challenged by Dr. M. Tracy Morrison, who testified as an expert witness for Parents. See Case 1 Tr. Vol. III p.7-54. Dr. Morrison is an occupational therapist with advanced post-doctoral training for four years in cognitive neuroscience. Case

1 Tr. Vol. III, p. 7; P. Ex. p. 732-737. Dr. Morrison developed assessments for executive functioning that are used as "gold standard" in occupational therapy and psychology. Case 1 Tr. Vol. III pp. 7-8. She now also operates a school, Engage, for 130 students, and provides outpatient behavior, speech, and occupational therapy services. Id. The school specializes in students who have ADHD, autism, and high anxiety. Id.

Morrison testified that she had reviewed District's occupational therapy evaluation, and it was her opinion that the District OT evaluation failed to identify Student's problem because the examiner did not go deeper in her evaluation.  Id. at p. 25.  The person who completed the Sensory Profile-2 screener did not have enough experience for the screener to be valid. Id. at p. 28. The evaluation measures Student's Visual-Motor Integration ("VMI") score at 1.4 standard deviations below average, but his visual perception is above average and motor coordination is average. Case 1 Tr. Vol. III p. 21; P. Ex. p. 467. Morrison testified that the evaluator should have conducted a Bruininks Oseretsky Test of Motor Proficiency ("BOT") to determine the reason for Student's low VMI in light of the results for visual perception and motor coordination. Case 1 Tr. Vol. III p. 21-24. While the evaluator recognized that Student's drawing patterns "were immature," citing that he drew bottom to top and right to left, she stated that "this did not affect the quality of his performance." Id. p. 24- 25; Case 1 P. Ex. p. 467. Dr. Morrison testified that the evaluator's opinion should not negate the qualitative test data, and the evaluator should have gone deeper with the testing to determine why Student's VMI was so low. Id. If Student was struggling with fine motor skills, "he is going to fall behind in writing, possibly reading, he is going to struggle with precision, line, shapes, writing words, that he is probably going to experience a fair amount of anxiety when it comes to writing assignments... [I]t is like asking a five-year-old to do third

H-24-48 Page 15 of 47

grade work and then grading them at that level." Id. at p. 26. Dr. Morrison further questioned the validity of the School Function Assessment and the Sensory Profile of the evaluation. Id. p. 28-33. Morrison testified that if a student falls below one standard deviation on the Sensory Profile, then occupational therapy intervention is required, and Student's OT needs could not be met with 15 minutes of consultative services weekly. Id. at p. 34. Finally, Dr. Morrison testified that the executive functioning testing was not a standardized test with quantitative data. Id. at p. 36-37.

Shipman's report does not mention the DDC evaluation and diagnosis of Autism. In fact, Shipman admitted that she was not aware of the diagnosis, and District did not provide her with the report "until well after" her evaluation. Case 1 Tr. Vol. IV p. 132-133. While she conducted the evaluation on September 8, 2023, Shipman noted in her October 2, 2023, consultation notes that she discussed with the IEP team "executive functioning and Dennis Developmental report," noting that Student's diagnosis was changed to Autism. Case 1 P. Ex. p. 489. Shipman testified that knowing that diagnosis would be a considerable influence on her evaluation of Student. Id. Yet, two months later, Shipman's 2022-2023 Occupational Therapy Annual Review dated December 8, 2023, still does not reference the diagnosis of Autism or the DDC evaluation. See Case 1 P. Ex. p. 474-475. Shipman also testified that she did not know that Student was still sucking his thumb in the third grade, and that it was "concerning." Case 1 Tr. Vol. IV p. 132.

### 3. September 21, 2023, OSS.

On September 21, 2023, Student had a PBIS Major Referral for exiting the classroom without permission, taking and refusing to release a balloon, walking into other classrooms, and slapping a teacher on the leg. Case 1 D. Ex. p. 589. Student received a one-day OSS. Id.

### 4. October 2, 2023, IEP Team Meeting.

The IEP team met on the morning of October 2, 2023, to review the DDC evaluation, the new specialized evaluation, and new occupational therapy evaluation. Case 1 D. Ex. p. 324. The team adopted the occupational therapist's recommendations and added some accommodations to "help with executive functioning concerns." Case 1 P. Ex. p. 21. The team also noted his primary diagnosis as Autism. Case 1 P. Ex. p. 36.

### 5. October 2, 2023, OSS.

On the afternoon of October 2, 2023, Student left his classroom, and was intercepted by the School Resource Officer and another teacher. Case 1 D. Ex. p. 587. Upon his return to the classroom, he threw a Chromebook, knocked over a desk, and left the classroom again. Student received a two-day OSS. Id.

### 6. October 13, 2023, IEP Team Meeting.

The IEP team met as a result of Student's October 2nd behavior incident. Case 1 P. Ex. p. 39-40. Parents requested the District consider one-on-one paraprofessional support for Student following the OSS. Id. The IEP Team further considered changing Student's IDEA category to Autism, which they decided was appropriate, and considered a paraprofessional for Student due to his October 2nd behavior incident, and the team considered providing a temporary paraprofessional as part of a student support assessment for determining if a permanent paraprofessional would be beneficial for Student. Case 2 P. Ex. p. 54-57. The team added services for instruction and a goal to support his needs in the area of emotional control. Case 1 P. Ex. p. 49. His behavior plan was revised and the Check-in/Check-out sheets amended to match the behavior goals. Parents raised for discussion that Student's use of the Chromebook leads to behavior problems and removal of the Chromebook was discussed, but

the District decided not to remove Student's access to the Chromebook. Case 1 P. Ex. p. 57. The Notice of Action documents that Parents were considering ABA therapy for behavioral support at that time.  See Case 2 P. Ex. p. 58.

### 7. October 16, 2023, OSS.

On October 16, 2023, Student became upset when his teacher locked his Chromebook, left his classroom, and went to another room where he locked himself in. Case 1 D. Ex. p. 585. When the door was unlocked, he ran to another office, turned chairs over, hit his mental health counselor, and eloped from the building. Id. Student received a one-day OSS. Id.

### 8. October 23, 2023, OSS.

On October 23, 2023, Student received a PBIS Major Referral resulting in a three-day OSS, for arguing with his teacher over unifix cubes and his Chromebook, then escalating to throwing items off of her desk, leaving the classroom, cursing his mental health counselor when she encountered him, knocking over desks and a utility cart, slapping his teacher twice, and throwing objects at a student. Case 1 D. Ex. p. 582.

### 9. October 27, 2023, IEP Team Meeting.

The IEP team met again to discuss Student's problematic behaviors, and to again discuss a one-on-one paraprofessional to support Student. Case 1 P. Ex., p. 59. The team decided to delay adding a permanent paraprofessional until a student support assessment could be conducted, and instead provided a temporary student support paraprofessional. Case 1 P. Ex. p. 71, 74, 146. The Notice of Action further states, "Robinson Elementary has requested behavior support services with the district Behavior Intervention Specialist. [Student]'s parents are considering ABA therapy for behavior support at this time. Id. Although Student's amended IEP reflects that he remained in general education 86% of the

time, the IEP Placement Change form reflected that Student's placement would thereafter be in the resource classroom 40-79% of the school day. Case 1 P. Ex. 69; Case 2 P. Ex. p. 59. It was still noted that small group instruction was necessary for Student to acquire skills specified in the IEP, behavior intervention strategies established in the child's IEP require a degree of structure that cannot be implemented in a large group setting, and child's behavior significantly impeded his or her learning and that of others, and additional individualized instruction is needed to facilitate learning. Case 2 P. Ex. p. 65. The one-on-one temporary paraprofessional was added to Student's IEP after the October 27, 2023 IEP meeting. Case 1 P. Ex. p. 74, 146.

   **10. October 30, 2023, OSS.**

   On October 30, 2023, Student received another PBIS Major Referral resulting in a one-day OSS after becoming upset when asked to put his Chromebook away, and his behavior escalated to walking around the room knocking things off the teacher's desk, throwing items, kicking book bins and knocking books onto the floor. Case 1 D. Ex. p. 583.

   **11. November 3, 2023, OSS.**

   Student received a PBIS Major Referral when, on November 3, 2023, he became angry about putting away his Chromebook, and escalated into threatening to throw his Chromebook, chairs, and cool-down crate at the teacher. Case 1 D. Ex. p. 580. Student began yelling at the teacher and School Resource Officer to "shut the [f***] up; shut the hell up." He then threw items out of the cool-down area, and hit the School Resource Officer. Student was given a three-day suspension. Case 1 D. Ex. p. 580.

   **12. November 13, 2023, MDR and OSS.**

   On November 13, Student received a PBIS Major Referral when he "told another

student to shut the [f***] up and then got up from his seat and got in the other student's face and said, 'I'm about to knock your face off.' ..." Case 1 D. Ex. p. 577-578. Student received a four-day OSS, which OSS brought the number of days that Student has been suspended since the first of school to twelve. Case 1 District. Ex. p. 672.

### 13. November 27, 2023, IEP Team Meeting.

As a result of the most recent suspensions, the IEP team met on November 27, 2023, to conduct an MDR, review Student's IEP, and behavior plan. Case 1 P. Ex. p. 91-92, 74-90, 93-98. The team first conducted an MDR and determined that Student's behaviors were a result of his disability. Case 1 P. Ex. p. 91-92, 224, 244. After Student's manifestation review, on November 27, 2023, the IEP team reviewed Student's BIP and added interventions that had been included on Student's prior BIP or IEP from 2022. See Case 1 P. Ex. p. 93-98, 224, 244, and 339. Student's behavior plan was also reviewed and revised by the IEP team. Case 1 P. Ex. p. 93-98. Also, at that meeting, the team amended the IEP to reflect that Student's special education minutes had doubled, were to be provided in the resource or self-contained classroom, and reduced Student's time in regular class to 57% of the time per week citing that small group instruction was necessary for Student to acquire skills specified in the IEP, behavior intervention strategies established in the child's IEP require a degree of structure that cannot be implemented in a large group setting, and child's behavior significantly impeded his or her learning and that of others, and additional individualized instruction is needed to facilitate learning. See Case 1 P. Ex. 23; Case 2 P. Ex. 86.

### 14. November 30, 2023, OSS.

On November 30, 2023, Student became upset when another student "bumped into him during indoor PE." Case 1 D. Ex. p. 575-576. His behavior escalated to throwing items

and attempting elopement. Student twice grabbed another student by the shirt collar, choking the student and swinging his fist at him. Student had to be pulled off the other student by three adults. Student received a five-day OSS. Case 1 D. Ex. p. 576.

**15. December 7, 2023, IEP Team Meeting – Annual Review.**

At the December 7, 2023 annual review of Student's IEP, attended by attorneys for the District and Parent, as well as Parents' Advocate, the IEP team reported that Student progressed to 20% accuracy on the behavior goal added on July 12 and made no progress on the second behavior goal added on October 2 related to emotional control. See Case 1 P. Ex. p. 109, 148. The Team amended Student's IEP, to include the following:

• Direct instruction in social skills, math, and English language arts, 300 minutes per week of each, placing Student in the regular education classroom 57.14% of the time. Student has nine goals for English language arts, five goals for math, and three goals for behavior.

• 15 minutes per week (60/month) of occupational therapy consultation is provided.

• A temporary one-on-one paraprofessional is provided for seven hours each day.

• Accommodations are included.

Case 1 P. Ex. p. 107-136. At the meeting, District requested consent for an FBA, and Parents agreed that an FBA should be conducted. Case 1 P. Ex. p. 148. However, Parents requested that Dr. Barnes, BCBA, conduct it, and District agreed to consider it. Id. Also, at this meeting Parents objected to Student receiving instruction using multiple different dyslexia interventions, and the District interpreted this as a request to discontinue dyslexia intervention services. Case 1 P. Ex. p. 107, 148, 150; Case 1 Tr. Vol. I p. 201. Father testified he thought everyone agreed that Student would continue dyslexia services with Ms. Morris and receive homebound instruction, and Parents only did not want the Sonday program.

Case 1 Tr. Vol. III p. 204-207. The IEP team noted that Student's mental health therapy sessions increased from one to two per week "to assist and support behavioral concerns, strategies, and interventions." Id. Student's Behavior Support Plan remained in place pending additional behavior data. Case 1 P. Ex. p. 110, 143-146. Parents requested a speech therapy evaluation to determine if Student would benefit from pragmatics instruction. See Case 1 P. Ex. p. 107. Further, Parents requested Student be temporarily changed to homebound while Parents assessed his reaction to a new medication. See Case 1 P. Ex. p. 107; Case 1 Tr. Vol. III p. 202-203. Parents' requests were not granted, except Student's dyslexia services were discontinued entirely. See Case 1 P. Ex. 146-153.

**16. December 12, 2023, Pediatrics Plus Occupational Therapy Evaluation.**

On December 12, 2023, Parents presented Student for an occupational therapy evaluation by Pediatrics Plus. Case 1 P. Ex. p. 455. The evaluation report acknowledges the Autism diagnosis of May 2023 by DDC. Id. Pediatrics Plus administered the BOT-2, including four fine motor subtests: fine motor precision, fine motor integration, manual dexterity, and upper-limb coordination." Id. at p. 455-461. The report states that Student "presented with moderate to severe delays in all areas of the BOT-2." Id. at p. 456. The report then states that Student exhibited a "moderate delay in social/cognitive skills" on the Pediatric Evaluation of Disability Inventory-Computer Adaptive Test (PEDI-CAT). Id. at p. 457. Finally, the report includes clinical observations concerning Student's sensory processing, as follows:

> Conduct: [Student] almost always can be stubborn and uncooperative, has temper tantrums, resists eye contact, and frequently rushes through coloring/writing/drawing, seems more active than same aged children, and does things in a harder way than is needed.
>
> Social Emotional: [Student] almost always seems to have low self-esteem, needs positive support to return to challenging situations, is sensitive to criticisms, has definite predictable fears, expresses feeling like a failure, is too

serious, has strong emotional outbursts when unable to complete a task, struggles to interpret body language or facial expression, gets frustrated easily, has fears that interfere with daily routines, is distressed by changes in routines/plans/expectations, interacts or participates in groups less than same aged children, and frequently has difficulty with friendships. Id. at p. 459.

**17. December 13, 2023, MDR.**

On December 13, 2023, District conducted an MDR, for the incident that occurred on November 30, 2023, which was delayed at Parents' request. See Case 1 p. Ex. p. 141-142, 153. The Notice of Action from the MDR states, "the IEP team conducted a Functional Assessment Analysis of Problem Behavior," reviewed Student's BIP for positive interventions and supports, and reviewed Student's IEP for behavior goals related to target behaviors. See Case 1 P. Ex. p. 153, 663. Again, this is not an FBA but is part of the behavior analysis done for the MDR. Case 2 Tr. Vol. I p. 72-73. The BIP was unchanged. Compare Case 1 P. Ex. p. 93-94 and 143-44. Student's behavior was determined to be related to his disability, and Student was given assignments and services during the suspension. Id. Although Student's suspension was completed on December 6, 2023, Parent expressed that Student would remain at home through December 15, 2023 for monitoring due to a medication change. Case 1 P. Ex. p. 151. However, Student never returned to school after December 7, 2023. Case 2 P. Ex. p. 205.

**18. Fall 2023 Suspension Total**

At the December 13, 2023 meeting, District noted that this was the sixth time Student has been suspended during the 2023-2024 school year (third grade) for "a total of sixteen days," which the team determined constituted a change of placement. Case 1 P. Ex. p. 153. However, according to Student's attendance records, the actual total number of days Student was suspended in the fall semester of his third-grade year was seventeen. Case 1 P. Ex. p. 554; Case 1 Tr. Vol. II p. 147.

Principal admitted she knew the District's behavior plan for Student was not working prior to the December 7, 2023 meeting. Case 1 Vol. II p. 148-150. The Special Education Teacher admitted that what the District was doing for Student's behavior was not working in December of 2023. Case 2 Tr. Vol. I p. 46; Case 1 Tr. Vol. II p. 149.  In attempt to remedy this, Principal had contacted the District's Behavior Specialist, who was doing observations, the District had implemented the temporary one-on-one paraprofessional, the District was looking at increasing Student's social skills time with Ms. Morris, and the District asked for a new FBA at the December 7, 2023 annual review. Case 1 Vol. II p. 150. District asserts it agreed to an FBA by Sheila Barnes around this time. Case 2 Tr. Vol. I p. 43. Special Education Teacher admitted the District was supposed to perform an FBA after an MDR, but the last FBA the District performed for Student was in 2022. Case 2 Tr. Vol. I p. 74. The Functional Analysis of Behavior form the District completed in the MDRs was not an FBA.  Id.

Father testified that at the last two meetings, in December 2023, the District had no plan to handle Student's behaviors, other than suspensions, day treatment or ALE and that Student's behavior was impacting his education, particularly his reading. Case 1 Tr. Vol. IV. p. 21, 23, 27-30, 69.  Principal told parents, "I have no idea" and "I don't know what to do." Case 1 Tr. Vol. IV, p. 30.  Parents changed Student's medication in an attempt to help control Student's behavior in December 2023 and kept him home to monitor the effects of the new medication. Case 1 Tr. Vol. II p. 149-150; Case 1 Tr. Vol. IV p. 28-30.

**19. January 5, 2024 District Letter**

By letter dated January 5, 2024, the District notified Parents that Student would be "dropped as a student" due to absences and that the matter would "be turned over to the Prosecuting Attorney." See Case 1 P. Ex. 171.  The District also filed Due Process Complaint

H-24-27 regarding an OT evaluation for Student, which later was dismissed with prejudice. Case 2 P. Ex. 379.

### 20. January 8, 2024 Due Process Complaint H-24-30

On January 8, 2024, Parents filed due process Complaint, H-24-30 (herein referenced as Case 1).  See Case 2 P. Ex. p. 357; Case 1 Tr. Vol. III p. 222-225.  In the hearing regarding Case 1, The District objected to testimony regarding the resolution conference that occurred on January 19, 2024 because the complaint in Case 1 was filed on January 8, 2024, so evidence beyond January 8, 2024 was beyond the scope of the complaint in Case 1.  See Case 1 Tr. Vol. III p. 222-225.  Parents request for reimbursement for private school placement was not plead in the complaint in Case 1 (H-24-30) filed on January 8, 2024.  Compensatory education was the remedy pled in Case 1.

### E. Academics

Father testified that Student began regressing in second grade. Case 1 Tr. Vol. III p. 92. Comparing Student's RIT scores from NWEA MAP testing Spring 2022 (end of second grade) to Fall 2023 (beginning of third grade), Student's RIT scores in math dropped from a 174 RIT score to 156. Case 1 P. Ex. p. 541.  However, by the Fall 2023 NWEA MAP testing, Student's RIT score in math was a 189, which was on grade level. Id. Similarly, in the third grade, Student's STAR math test scores rebounded by November of his third-grade year, from a grade equivalent of 2.1 in STAR Math at August 22, 2023, to a grade equivalent of 3.1 at November 26, 2023. Case 1 P. Ex. p. 542.

Morris testified that by the end of the second grade, Student was behind more than two grade levels in reading. Case 1 Tr. Vol. I p. 185. She also testified that he had difficulty with testing both behaviorally and academically. Case 1 Tr. Vol. I p. 179. In September, 2023,

Student's NWEA MAP reading scores were below mean (29th percentile) for growth and for achievement (7th percentile). Case 1 D. Ex. p. 606-607. His language arts achievement score was also below mean (6th percentile). Case 1 D. Ex. p. 615-616. District points to Student's STAR Reading test given on April 6, 2023, was 3.3, above third grade level. Case 1 P. Ex. p.535; Case 1 Dist. Post-Hearing Brief, p. 9. However, Student's reading level regressed to a grade equivalent of 2.1 on August 23, 2023, to a grade equivalent of 1.8 on November 26, 2023 (mid-point of third grade). Case 1 P. Ex. p. 525. By November of Student's third-grade year, Student was struggling behaviorally with seven days of suspension in November, before the STAR tests were administered. Case 1 D. Ex. p. 672. Further, NWEA MAP testing for third grade indicates a Lexile Level of BR-145L-5L, a beginning reader level that Blanton testified is mid to end of kindergarten. Case 1 P. Ex. p. 503, 505; Tr. Vol. II p. 11.

## II. FINDINGS OF FACT IN H-24-28

1.      During the dates at issue in this matter, between January 9, 2024 and May 23, 2024, Student was a nine-year-old male (born in August 2014) in the third grade residing in Roland, Arkansas with Parents, which is in the District. See Case 2 Tr. II p. 83; Case 2 P. Ex. p. 214, 323.

2.      By letter dated February 1, 2024, Parents notified District of their intent to enroll Student in a private school and asked the District to agree to the change of placement because the District was not providing Student with research-based Dyslexia and Math instruction, the direct OT minutes requested. Case 2 P. Ex. 206-207. The letter also enclosed a copy of a letter from Student's doctor supporting homebound educational services through 2/21/24. Case 2 P. Ex. 206-208.

3.      District does not permit ABA therapy in its buildings, and the Special

Education Teacher did not request an exception for Student. Case 1 Tr. Vol. I p. 151-156. The District Behavior Specialist recalled that Student needed ABA Therapy, but she confirmed that the District does not provide ABA therapy, as a school policy. Case 2 Vol. II p. 60-63. The District only provides STAR for Autism, which is only appropriate for students with impaired development, and Student does not have impaired intellectual development. Case 2 Vol. II p. 61; Case 2 D. Ex. p. 183.

4.      The District's Behavior Specialist was in her second year in that position in the District in the fall of 2024. Case 2 Vol. II p. 57. The District's Behavior Specialist has certifications in special education and administration, but she has no certifications related to behavior or behavior interventions, although she did complete BCBA and Crisis Intervention training through the Arkansas Department of Education. Id. and p. 67. The District Behavior Specialist did not recall being provided with the DDC evaluation diagnosing Student with Autism. Case 2 Vol. II p. 59. She also confirmed that an FBA consists of observations and data collection to assess the functions of behaviors. Case 2 Vol. II p. 68.

5.      On February 12, 2024, Parents again notified District by letter of their intent to enroll Student in a private school, in addition to the reasons cited in the February 1, 2024 letter, because the District did not provide Student with the homebound services requested after the conclusion of Christmas break. Case 2 P. Ex. p. 209, and that same day, Parents enrolled Student in Compass Academy, a private school. Case 2 P. Ex. p. 323.

6.      Courtney Williams is the Director (again "Compass Director") of Compass Academy ("Compass"). Case 2 Tr. Vol. III p. 9.

7.      Upon enrollment, Student was a third grader and was assessed in reading and math to begin instruction at an appropriate level. Case 2 Tr. Vol. III p. 12-13, 16. Student was

assessed as "end of first grade" or "first of second grade" level in math and on a second-grade level in reading. Case 2 Tr. Vol. III p. 12. Compass provides reading instruction using the Wilson Reading Program, an intensive intervention designed for children with learning disabilities like dyslexia, and instruction occurs in small groups. Id. at p. 14. By April of 2024, on Benchmark testing, Students words correct had increased to 77 words from 43 in February and his accuracy increased from 89 percent in February to 93 percent in April. Id. at p. 13. His retelling went from 15 to 22, and his comprehension increased to 85 percent in April from 60 percent in February. Id. at p. 13. Student's DRA assessment showed he was at a Level 10 in reading in May of 2024, which is mid to high first grade. Id. at p. 14. When he arrived at Compass, he was reading words but did not want to read a book; he said it was too hard. Id. at p. 13. Student appears to be really benefitting from the Wilson Reading Program at Compass because he comes in with a chapter book he is reading now instead of a stuffed animal. Case 2 Tr. Vol. III p. 15-16.

8.      Regarding Student's behavior, Compass Director testified that, at first, Student did not want to interact with anybody – students or staff. Case 2 Tr. Vol. III p. 11, 18. At first, Student cursed, yelled, and destroyed some property. Id. at p. 18. The Compass staff learned how to connect with him, were consistent, and built trust. Case 2 Tr. Vol. III p. 18, 33. When trust and consistency were established, the behaviors decreased. Id. at p. 19, 33. On April 3, 2024, Student's social skills percentile rank on the Social Skills Improvement System Rating Scale (SSIS) was at the second percentile. Case 2 P. Ex. p. 349. Compass staff has taught Student social-emotional skills, for example, to tell staff when he is angry using appropriate words and volume, and coping skills so he could self-regulate. Case 2 Tr. Vol. III p. 19. The staff tracks Student's behavior, so they can monitor progress. Id. at p. 26. Student had 17

behavior episodes from February 12 to July 30, 2024 (2.8 per month), and only 7 behavior episodes from August 1, 2024 to October 23, 2024 (2.3 per month). Case 2 Tr. Vol. III p. 20, 25-28. Student's destruction of property and physical aggression have shifted more to verbal altercations. Id. at p. 37.

9.      Compass Director testified Student receives speech therapy and occupational therapy at Compass from licensed therapists. Case 2 Tr. Vol. III p. 40.

10.     Student also receives counseling from the Compass school counselor. Case 2 Tr. Vol. III p. 19. The Compass school counselor is also responsible for implementing Student's crisis plan to de-escalate Student when he has an outburst. Id. at p. 20. She was called frequently in the beginning, but the frequency decreased around summer time. Id. at p. 20. Now, Student will ask to see the counselor if he is struggling, instead of being destructive. Id. at p. 20.

11.     Further, Compass Director testified that Student is also receiving 25 hours per week of Applied Behavior Analysis ("ABA") therapy at Compass. Case 2 Tr. Vol. III p. 21. ABA therapy began in August of 2024, has helped identify Student's triggers, and has worked to teach Student to cope with them. Id. at p. 21-22. ABA therapy is provided at Compass for Student by Reach Therapy; Student's ABA therapy is primarily pushed into Student's class. Id. at p. 22-24. Student's ABA therapy is provided by an RBT, and a BCBA works with them several times throughout the week. Id. at p. 25. With ABA therapy, Student's inappropriate words have lessened a lot, and he will hesitate before speaking inappropriately now, which shows developing awareness and impulse control. Id. at p. 37.

12.     Compass has IEP goals for Student, and Student is making progress on the goals. Case 2 Tr. Vol. III p. 30-32; Case 2 P. Ex. p. 324-32.

13.     There are around three or four non-disabled students in the classes for grades fourth through sixth. Case 2 Tr. Vol. III at 55. Student's homeroom teacher is a licensed and certified teacher, and his teachers for math, history, and literacy are licensed and certified special education teachers. See Case 2 Tr. Vol. III p. 54-55.

14.     Compass is a year-round school, August through July. Case 2 Tr. Vol. III p. 49. Tuition is $9,500.00 per year. Id. There is a $200.00 new student fee and a $150.00 renewal fee each year. Id.

15.     Parents filed the complaint in H-24-48 (Case 2) on May 24, 2024. *See* Complaint H-24-10, requesting a remedy of reimbursement for private school tuition. See Case 2 Complaint.

16.     The transcripts and exhibits from Case 1 reflect that private school tuition reimbursement was not raised in Case 1. To have fully heard the issue of whether private school tuition reimbursement was appropriate for Student as a remedy of its own, the scope of the hearing in Case 1 would have had to exceed the time period for consideration in Case 1, which was from January 8, 2022 to January 8, 2024. Case 2 P. Ex. p. 360. As noted in the discussion between counsel for the District and counsel for the Parent during the hearing in Case 1, nothing beyond January 8, 2024 was pertinent to the hearing in Case 1, and in fact, counsel for the District objected when Parent counsel began to discuss evidence dated beyond January 8, 2024. Case 1 Tr. Vol. III p. 223-225. Finding herself corrected on the date of filing the Complaint in Case 1, Parent counsel withdrew her questions pertinent to the period after January 8, 2024. Id.

17.     On May 24, 2024, the prior Hearing Officer received post-hearing briefs from the Parents and the District in Case 1. See Case 1 Post-hearing Briefs. The District's post-

hearing brief did not address a request for private school placement, and the Parent's post-hearing brief did not address private school placement as an issue but requested that the prior hearing officer consider order private school tuition reimbursement as a form of compensatory education.    Compensatory education was the remedy requested in the complaint in Case 1, not private school tuition reimbursement.

17.    On June 4, 2024, the prior Hearing Officer issued her Final Decision and Order in Case 1. Case 2, P. Ex. p. 355-380. The prior Hearing Officer found the District committed violations of the IDEA that denied Student a FAPE. Id. at p. 176-78. The prior Hearing Officer made no factual findings regarding dates beyond the filing date (January 8, 2024) of the complaint in Case 1, and she made no factual findings or legal conclusions regarding the issue of reimbursement for private school tuition as a remedy.    In response to Parent's request that the prior Hearing Officer grant reimbursement for private school tuition as a form of compensatory education, the prior Hearing Officer merely noted that "Parents' request for private placement tuition is denied." Case 2 P. Ex. p. 179. Neither party appealed the Final Decision and Order in Case 1.

## CONCLUSIONS OF LAW AND DISCUSSION:

### I. Issue and Claim Preclusion

Parents and District agree that the principles of issue and claim preclusion apply to administrative hearings held pursuant to IDEA.  See Parent Post-hearing Brief at p. 25-26 and District Post-hearing Brief at p. 11-13.  In support of their arguments, Parents cite *Alexander v. Pathfinder, Inc.*, 91 F.3d 59, 62 (8th Cir. 1996), *Indep. School Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996), and *Mississippi Cnty. v. City of Blytheville*, 2018 Ark. 50, 10, 538 S.W.3d 822, 829 (2018).  In support of its arguments, the District cites *Ross ex. rel. Ross*

*v. Bd. Of Educ. Of Township High School. Dist. 211*, 486 F.3d 279, 282-85 (7th Cir. 2007); *Theodore v. District of Columbia*, 772 F. Supp. 2d 287, 293 (D.D.C. 2011); *Dutkevitch v. Pittston Area Sch. Dist.*, No. 3:12CV994, 213 U.S. Dist. LEXIS 103715, at *9 (M.D. Pa. July 24, 2013), and *Aetna Casualty & Sur. Co. General Dynamics Corp.*, 968 F.2d 707, 711 (8th Cir. 1992), *Lane v. Peterson*, 899 F.2d 737, 741 (8th Cir. 1990).

After reviewing cases cited by both parties, as well as other cases, this Hearing Officer finds that the principles of issue preclusion and claim preclusion may be applied to administrative hearings pursuant to IDEA. For issue preclusion to apply pursuant to Arkansas law, the following elements are required: (1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) it must have been determined by a valid and final judgment, and (4) the determination must have been essential to the judgment. *Mississippi Cnty. v. City of Blytheville*, 2018 Ark. 50; 538 S.W.3d 822, 829 (2018). Under Arkansas law, an unappealed administrative decision is a final judgment. *Alexander*, 91 F.3d at 62. When IDEA claims are exhausted through the administrative process, "principals of issue and claim preclusion may properly be applied to short-circuit redundant claims under other laws." *Indep. School Dist. No. 283* at 562.

In Case 1, the transcripts and exhibit books were filled with testimony and documents relevant to the issue of whether Student was provided FAPE between January 8, 2022 and January 8, 2024. Case 1 Tr. Vol. I, II, III, IV; P. Ex. 1-740 and D. Ex. p. 1-444. Parents pled the denial of FAPE in its Complaint in Case 1, and both post-hearing briefs discussed facts and law relevant to a finding of whether Student was provided FAPE between January 8, 2022 and January 8, 2024. See Case 1 Complaint and Case 1 Post-

hearing briefs by District and Parents. Further, the prior Hearing Officer spent 15 pages of her Final Decision and Order in findings of facts relevant to the provision of FAPE to Student during the time at issue. See P. Ex. p. 355-380. Notably, the remedy requested in Case 1 was compensatory education, while the remedy requested in Case 2, at bar, is private school tuition reimbursement. However, both remedies hinge on a finding that Student was denied FAPE.

## A. FAPE

In analyzing whether issue preclusion applies to the Case 1 determination regarding FAPE, there is no doubt that the provision of FAPE in the time period at issue was actually and thoroughly litigated in Case 1, that it was determined by a valid and final judgment as there was no appeal of the Case 1 Final Decision and Order, or that the determination regarding FAPE was essential to the judgment rendered in Case 1. The prior Hearing Officer's Final Decision and Order plainly found that the District's:

> IEP programming and implementation were not working for Student. His sensory issues, social skills deficits, and maladaptive behaviors continued to increase despite District's efforts. Even after Student was given seventeen days of suspensions, and Student's NWEA MAP and STAR reading and language arts scores had dropped, District was still unwilling to entertain the prospect that its programming or its staffing were not successful in meeting Student's educational needs. District's occupational therapy evaluation failed to fully evaluate all suspected areas of Student's disabilities and was, therefore, insufficient to provide a basis for meaningful, education-related strategies to meet Student's needs, Student's IEP, therefore, did not contain programming sufficiently tailored to Student's unique educational needs resulting from his autism, fine motor deficits, and sensory issues.

Case 1 P. Ex. p. 377. As the issue of the provision of FAPE from January 8, 2022 to January 8, 2024 was fully heard and adjudicated, this Hearing Officer will not disturb the determination of the prior Hearing Officer that Student was denied FAPE during the timeframe at issue in Case 1.

**B. COMPENSATORY EDUCATION**

After finding the District denied Student FAPE in Case 1, the prior Hearing Officer went on to analyze compensatory education for Student in light of the denial of FAPE, as compensatory education was the remedy pled in Case 1. Case 2 P. Ex. p. 378-379. The prior Hearing Officer granted Student compensatory education in the form of an order to the District to contract with the BCBA of Parents' choice. Case 2 P. Ex. p. 379. Notably, the prior Hearing Officer conducted no analysis of whether Student should be granted the remedy of reimbursement for private school tuition, as that remedy had not been pled and no evidence was heard to support such a finding. Case 2 P. Ex. p. 355-380. As with the provision of FAPE, this Hearing Officer will not disturb the determination of the prior Hearing Officer with regard to compensatory education.

**C. PRIVATE SCHOOL TUITION REIMBURSEMENT**

In contrast to the issues of FAPE and compensatory education for Student from January 8, 2022 to January 8, 2024, Private school tuition reimbursement was not raised in Case 1, except that Parents raised it in their post-hearing brief, as a possible form of compensatory education, and the prior Hearing Officer denied private school tuition reimbursement as a form of compensatory education, not as a remedy of its own. To have fully heard the issue of whether private school tuition reimbursement was appropriate for Student as a remedy of its own, the scope of the hearing in Case 1 would have had to exceed the time period for consideration in Case 1, which was from January 8, 2022 to January 8, 2024. As detailed above, counsel for the District objected when Parent counsel began to discuss evidence dated beyond January 8, 2024, and finding herself corrected on the date of filing the Complaint in Case 1, Parent counsel withdrew her questions pertinent to the

period after January 8, 2024. As detailed above, Student was not enrolled in Compass until February 12, 2024. Although this Hearing Officer appreciates the District's arguments regarding judicial efficiency, the issue of private school tuition reimbursement was not fully heard or adjudicated in Case 1 and could not have been heard or adjudicated in Case 1.

Moreover, the legal analysis required for private school tuition reimbursement differs from the analysis required to determine whether a Student should receive compensatory education. Regarding compensatory education, the Eighth Circuit has stated "[w]hether District is able to provide FAPE prospectively is irrelevant to an award of compensatory education," but a claim for private school tuition must include proof that the school district cannot prospectively provide a FAPE. *Indep. Sch. Dist. No. 283 v. E.M.D.H.,* 960 F.3d 1073, 1085 (8th Cir. 2020). In *Indp. Sch. Dist. No. 283 v. E.M.D.H. by & Through L.H.,* 357 F. Supp. 3d 876, 891 (D. Minn. 2019), the district court reversed an award of private school tuition as compensatory education finding, "there is scant evidence concerning whether the District can provide a FAPE prospectively."

As the prior Hearing Officer decided the District denied Student FAPE between January 8, 2022 and January 8, 2024, the sole remaining issue in Case 2, at issue here, is whether Student should receive reimbursement for private school tuition, which requires a determination of the sub-issues of (1) whether the District could prospectively provide Student with FAPE and (2) whether Student's private school placement is appropriate or "proper." The IDEA authorizes tuition reimbursement for placement in private schools in situations where a district is unable to provide an appropriate placement for a student and the private school placement, itself, is deemed appropriate. *See D.L. by Landon v. St. Louis City Sch. Dist.,* 950 F.3d 1057, 1066 (8th Cir. 2020). ADE Spec. Ed. Rules §10.01.22. *Sch.*

*Comm. of Town of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 369 (1996). To receive the remedy of reimbursement for private school tuition, Parents must establish two requirements: that the school failed to provide a FAPE; and that the private school is an "appropriate" placement within the meaning of the IDEA. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 242–43 n. 9, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009); *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

A claim for private school tuition must include proof that the private school "is an 'appropriate' placement within the meaning of the IDEA." *Sneitzer v. Iowa Dept. of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015A private placement need not satisfy a least restrictive environment requirements to be appropriate. *C.B. ex re. B.B. v. Special Sch. Dist. No. 1, Minneapolis, Minn*, 636 F.3d 981, 991 (8th Cir. 2001). Although the IDEA does require that students with disabilities be educated in the least restrictive environment pursuant to 20 U.S.C. §1412(a)(5), the principal that IDEA does not sacrifice a student's access to FAPE to have him in a more integrated setting was recently confirmed by the Eighth Circuit Court of Appeals in *J.P. v. Belton School Dist. No. 124*, 40 F.4th 887 (8th Cir. 2022). Furthermore, to show an alternative placement for a student is "proper" within the meaning of IDEA, parents need not show the placement meetings state education standards. *T.B. ex rel. W.B. v. St. Joseph School Dist.*, 677 F.3d 844 (2012) (citing Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A. § 1400 et seq.). The Eighth Circuit Court of Appeals has previously held that movement to another school district does not prohibit a student from seeking compensatory education from a prior school district for violations of FAPE. *Indep. Sch. Dist. No. 283 v. A.C.*, 358 F.3d 769, 774 (8th Cir. 2001).

### 1. FAPE

As detailed above, the prior Hearing Officer determined in Case 1 that the District failed to provide Student FAPE from January 8, 2022 to January 8, 2024, and this Hearing Officer will not disturb those finding of fact or law. Student received no education or services from the District after January 8, 2024, so no further analysis of FAPE is required or appropriate in this Case 2.

### 2. WHETHER THE DISTRICT CAN PROSPECTIVELY PROVIDE FAPE

Although no further analysis of the facts during the timeframe of Case 1 is required for a finding that the District did not provide Student FAPE from January 8, 2022 to January 8, 2024, the facts occurring during the timeframe of Case 1 are relevant to this Hearing Officer's determination of whether the District could prospectively provide FAPE.

Based on the record, the District's denial of FAPE to Student in Case 1 was not due to a failure to convene the IEP Team; instead, the District appeared to lack the tools Student needed to provide Student a FAPE. As a second grader who was already diagnosed with ADHD and Impulse Control and Conduct Disorders, Student received his first suspension from school for behavior incidents occurring on April 12 and 18, 2023, and Student's IEP team met on May 1, 2023 in response. On May 2, 2023, Student had another behavioral incident, as detailed above, and the IEP team met on May 8, 2023 in response. Over the course of the spring 2023 and fall 2023 semesters, the team amended Student's IEP to add social skills instruction, added behavior goals, increased special education minutes in an attempt to reduce transitions and disruptions, attempted to adjust the behavior plan by adding strategies that had worked in the past, amended his crisis plan. The IEP team amended the IEP, amended Student's Behavior Management Plan, and completed a form

titled Functional Assessment Analysis of Problem Behavior, which Special Education Teacher admitted is not an FBA but is part of the behavior analysis done for the MDR.

As a result of Student's diagnosis of Autism by DDC, the July 12, 2023 IEP Team approved new evaluations for achievement, executive function, behavior, and sensory processing and amended the IEP to add a new behavior goal and revised Student's accommodations. The District's specialized reevaluation occurred on September 14, 2023 and was conducted by Rebecca Smith, M.S., District's licensed school psychology specialist. The report recommends that Student "meets eligibility criteria for special education services under the IDEA category of Autism." Conclusions from the evaluation included: (a) multiple characteristics of his ASD diagnosis affecting his acquisition of educational objectives as well as socially; (b) significant adaptive skills deficits in Communication, Functional Academics, and Social areas; (c) [BASC-3 adaptive scores] At-Risk and/or Clinically Significant score [both school and home settings] in ... Aggression, Conduct Problems, Depression, Attention Problems, Atypicality, Adaptability, Leadership, Anger Control, Bullying, Emotional Self-Control, Executive Functioning, Negative Emotionality, Resiliency, ADHD Probability, Autism Probability, Emotional Disturbance Probability, and Functional Impairment; (d) [BRIEF-2 Scores (teacher form)] ... Clinically Elevated ratings in the areas of Inhibit, Self-Monitor, Shift, Emotional Control, and Working Memory with Potentially Clinically Elevated scores in Initiate, Plan/Organize, and Organization of Materials; and (e) [KTEA-3 academic skills] ... below average abilities in basic reading skills, reading comprehension, math problem solving, math calculation, and silent reading fluency, and word recognition fluency ... [and] significant deficits in written expression and decoding abilities.

The second evaluation that came out of the July 12, 2023 IEP Team meeting was

occupational therapy initial evaluation that was conducted on September 8, 2023, by Missy Shipman, an occupational therapist employed by District. Her report was issued on October 2, 2023 and concluded that 15 minutes of weekly consultative occupational therapy services was all that Student needed. However, Shipman's report does not mention the DDC evaluation and diagnosis of autism, and Shipman was not aware of Student's Autism diagnosis "until well after" her evaluation. Knowing that diagnosis would have considerably influenced Shipman's evaluation of Student.

Dr. M. Tracy Morrison, an occupational therapist with advanced post-doctoral training for four years in cognitive neuroscience, disputed Shipman's conclusion that Student's OT needs could be met with 15 minutes of consultative services for Student weekly did not align with the data in Shipman's report. Dr. Morrison testified that the evaluation was flawed because Shipman should have conducted a Bruininks Oseretsky Test of Motor Proficiency ("BOT") to determine the reason for Student's low VMI in light of the results for visual perception and motor coordination, but that was not done. In addition, Dr. Morrison questioned the validity of Shipman's School Function Assessment and the Sensory Profile of the evaluation. Dr. Morrison testified that if a student falls below one standard deviation on the Sensory Profile, then occupational therapy intervention is required, and Student's OT needs could not be met with 15 minutes of consultative services for Student weekly.

In the fall of 2023, in Student's third grade year, Student's behavior incidents and IEP meetings in response resumed. On September 21, 2023, Student received a PBIS Major Referral, and on October 2, 2023, the IEP Team met in response. At that time, Parents requested a para-professional for Student, and Student remained in general education 86% of the time. On October 2, 2023, Student had another behavior incident and received a two-

day OSS, which resulted in another IEP Team meeting on October 13, 2023. At the October 13, 2023, IEP Team changed Student's IDEA category to Autism and decided to provide a temporary paraprofessional as part of a student support assessment. The Notice of Action documents that Parents were considering ABA therapy for behavioral support at that time.

Again, on October 16, 2023 and on October 23, 2023, Student had behavior incidents, which resulted in OSS.  In response to the behavior incidents on October 16 and 23, 2023, on October 27, Student's IEP team met again to discuss Student's behaviors and again discussed a one-on-one paraprofessional to support Student.  The team delayed adding a permanent paraprofessional until a support assessment could be conducted and continued to provide a temporary one-on-one paraprofessional.  At that meeting, the team doubled Student's special education minutes, to be received in the resource or self-contained classroom, and reduced Student's time in regular class to 57% of the time per week citing that small group instruction was necessary for Student to acquire skills specified in the IEP, behavior intervention strategies established in the child's IEP require a degree of structure that cannot be implemented in a large group setting, and child's behavior significantly impeded his or her learning and that of others, and additional individualized instruction is needed to facilitate learning.

Student continued to receive suspensions throughout the year even after he was placed in the resource classroom for 43 percent of the school day.  On October 30, 2023, November 3, 2023, and November 13, 2023, Student had additional behavior incidents resulting in OSS after each incident.  In light of Student's most recent behavior incidents, Student's IEP Team met again, on November 27, 2023. The team first conducted an MDR and determined that Student's behaviors were a result of his disability.  After Student's

manifestation review, on November 27, 2023, the IEP team reviewed Student's BIP and added interventions that had been included on Student's prior BIP or IEP from 2022.   On November 30, 2023, Student had a behavior incident in which resulted in a five-day OSS.

At the December 7, 2023 IEP meeting for Student's annual review, the team deferred the MDR at Parents' request and reported that Student progressed to 20% accuracy on the behavior goal added on July 12 and made no progress on the second behavior goal added on October 2 related to emotional control.  The BIP was not revised at this IEP meeting; the BIP from May 2023 remained in place.  Also, at this meeting Parents objected to Student receiving instruction using multiple different dyslexia interventions, and the District interpreted this as a request to discontinue dyslexia intervention services, although Parents thought everyone understood that Student was to continue to received dyslexia curriculum from the Special Education Teacher, and that only the Sonday program was to be discontinued. Parents requested a speech therapy evaluation to determine if Student would benefit from pragmatics instruction and an FBA by Dr. Shelia Barnes.  Further, Parents requested Student be temporarily changed to homebound while Parents assessed his reaction to a new medication.  After the meeting, Parents' requests were not granted, but dyslexia services were discontinued entirely.

On December 13, 2023, District conducted an MDR, for the incident that occurred on November 30, 2023. The IEP team determined that Student's "behavior was related to [his] disability," and make up work was provided to Student.  The Notice of Action from the MDR states, "the IEP team conducted a Functional Assessment Analysis of Problem Behavior," reviewed Student's BIP for positive interventions and supports, and reviewed Student's IEP for behavior goals related to target behaviors.  Again, this is not an FBA but is part of the

behavior analysis done for the MDR. The BIP was unchanged. IDEA requires an FBA to be conducted after a manifestation determination review, or the IEP team can review the BIP and modify it. See 20 U.S.C. §1415(k)(1)(F)(i). Student struggled with behavior and had multiple MDR's between April and December of 2023; however, Student's last FBA was completed in 2022.

Although Student's suspension was completed on December 6, 2023, Parent kept Student at home through December 15, 2023 due to a medication change. Parents changed Student's medication in an attempt to help control Student's behavior in December 2023 and kept him home to monitor the effects of the new medication.

Student was suspended out of school for 17 days in the fall semester of his third-grade year. Father testified that at the last two meetings, in December 2023, the District had no plan to handle Student's behaviors, other than suspensions, day treatment or ALE and that Student's behaviors were impacting his education. Principal told parents, "I have no idea" and "I don't know what to do." Principal admitted she knew the District's behavior plan for Student was not working prior to the December 7, 2023 meeting. The Special Education Teacher admitted that what the District was doing for Student's behavior was not working in December of 2023. In attempt to remedy this, Principal had contacted the District's Behavior Specialist, who was doing observations, the District had implemented the temporary one-on-one paraprofessional, the District was looking at increasing Student's social skills time with Ms. Morris, and asked for a new FBA at the December 7, 2023 annual review. District asserts it agreed to an FBA by Sheila Barnes around this time.

Student's IEP Team was aware that Student needed small group instruction to acquire skills specified in the IEP, behavior intervention strategies established in the child's IEP

require a degree of structure that cannot be implemented in a large group setting, and child's behavior significantly impeded his or her learning and that of others, and additional individualized instruction is needed to facilitate learning. Based on the testimony of the Special Education Teacher, Teacher, the Compass Director, and Father, Student's ability to learn in the area of reading and other areas had been significantly impacted by his behavior.

The District received and reviewed the DDC evaluation recommending the maximum time allowed in all areas of therapy recommended, including ABA therapy, behavioral counseling, speech therapy for pragmatic language/social skills, and occupational therapy to address Student's fine motor skills deficits and sensory issues. ABA Therapy can be a related service if it is necessary to allow Student to access his education, and based on the DDC recommendations, Student's behavior and test scores in the fall of 2023, and Student's response to ABA therapy at Compass, this Hearing Officer finds ABA to be a related service necessary to allow Student to access his education during the period at issue. *See* 20 U.S.C. §1401(29); 20 U.S.C. §1414(d)(1)(A)(i)(IV), and *Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 143 S.Ct. 859 (2023), However, the District did not consider providing ABA therapy for Student due to the District's policy against doing so.

Due to the District's inability to reign in Student's behaviors over the course of the spring and fall semesters of 2023 despite alterations to special education time and changes in goals, the District's policy of not providing the ABA therapy Student needs to access his education at this time, the absence of District curriculum for Students who have Autism without intellectual impairment, and the failure to conduct an FBA over the course of 2023, Student's experienced a deprivation in his education, and for these reasons, this Hearing Officer finds that the District is unable to prospectively provide FAPE to Student.

### 3. WHETHER COMPASS IS AN APPROPRIATE PLACEMENT FOR STUDENT

From April to December of 2023, the general education and special education environments at the District resulted in educational deprivation to Student because the Student's behaviors were uncontrolled causing him to be removed from instructional time and suspended seventeen days in the fall of 2023, not to mention the educational time Student lost during the behavior incidents. Any social benefit Student may have received from being in the general education setting was certainly to the detriment of his education, and, as discussed above, Student's educational benefit cannot be sacrificed for LRE.

Parents placed Student at Compass on February 12, 2024, after requesting the District transfer his placement on February 1, 2024 and after notifying the District that the Parents were unilaterally placing Student at Compass on February 12, 2024. Regarding whether Student's placement at Compass is appropriate, the District acknowledged on Student's IEPs throughout 2023 that Student needed the small group and more structured setting to learn, and Compass provides that, allowing Student to receive his education and make progress. Although the form is different from that of the Arkansas Department of Education, Student has an IEP at Compass and is making progress toward his goals. This is evidenced by both his progress on test scores and that his interest has shifted from stuffed animals to books.

Compass has several nondisabled students in Student's classes. Student's reading and math teachers at Compass are certified in special education, and his other teachers are also certified in special education or in general education. Student receives 25 hours of ABA therapy per week with an RBT and supervising BCBA at Compass, as well as counseling, OT, and speech therapies, and those therapies are working to decrease the frequency and severity of Student's behaviors. With behavior issues minimized, Student is able to access

educational benefit and has consequently improved his reading and math scores considerably. After reviewing the ability of the Compass Academy, to provide Student's education, this Hearing Officer finds that Compass Academy is an appropriate placement for Student.

### 4. Transportation

When a hearing officer concludes that a school district failed to provide FAPE and the private placement was suitable, they must consider all relevant factors in determining whether reimbursement for some or all of the cost of the child's private education is warranted. *Forest Grove Sch. Dist. V. T.A.*, 557 U.S. 230, 247, 129 S.Ct. 2484 (2009). Under IDEA, a student's home school district remains responsible for transportation pursuant to 20 U.S.C. §1412(a)(10)(B)(i)(child placed in private school entitled to all IDEA rights); 34 C.F.R. §300.325(c) school district still responsible for compliance with IDEA); 20 U.S.C. §1401(26)(A)("Related Services means transportation . . . "); 34 C.F.R. §300.34 (same); ADE Spec. Ed. Rules §2.56 (same). "Transportation includes [t]ravel to and from school and between schools." 34 C.F.R. §300.34.(c)(16). However, in Arkansas, a transfer student, who attends a school district through school choice, or the transfer student's parent is responsible for the transportation of the transfer student to and from the school in the nonresident district where the transfer student is enrolled. Ark. Code Ann. § 6-18-1904(d).

This Hearing Officer notes that Student lives in Roland, Arkansas and has attended the District since kindergarten. On the other hand, this Hearing Officer has broad discretion in crafting its remedy, the District's inadequacies detailed above are consequential, and the available compensatory remedies are limited. Student cannot go back and reclaim the quality instruction and therapy minutes lost in 2023, and Student is unlikely to be able to

benefit from additional therapy sessions beyond those that he is receiving in his full school days at Compass. Therefore, this Hearing Officer grants Parents' request for reimbursement of transportation expenses as a portion of Parents' remedy.

### FINAL CONCLUSIONS AND ORDERS:

Upon consideration of all the testimony and evidence, this Hearing Officer finds that a preponderance of the evidence warrants the following:

1.  Pursuant to the prior Hearing Officer's findings of facts and law in Case 1 (Consolidated H-24-27 and H-24-30), the District denied Student FAPE during the period at issue.

2.  Finding the District is unable to prospectively provide Student FAPE and that Compass Academy is an appropriate placement for Student, this Hearing Officer grants the request for placement at Compass and reimbursement for one year's tuition of $9,500.00 and the new student fee of $200. District shall reimburse parents within 60 days of the date of this Final Decision and Order.

3.  Parents request for reimbursement for transportation expenses is granted for the period from January 9, 2024 to December 31, 2024. Within 60 days of Parents' production of Student's attendance record to establish the dates of travel and a print out of Google Maps or other reliable resource establishing the number of miles required to transport Student from home to Compass for school each day, District shall pay Parents mileage at the rate of 52 cents per mile for each mile Student was transported to and from Compass for school between January 9, 2024 and December 31, 2024.

4.  Parents also alleged that the District's conduct constitutes disability discrimination in the Consolidated Case pursuant to §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a)

or Title II of the Americans' with Disabilities Act, 42 U.S.C. § 12131-12165. This Hearing

Officer has no jurisdiction over disability discrimination claims. *See* ADE Spec. Ed. Rules

§10.02.22.1. Therefore, to the extent Parents' due process complaints raise disability

discrimination claims, those claims are dismissed.

### FINALITY OF ORDER AND RIGHT TO APPEAL:

The decision of this Hearing Officer is final. A party aggrieved by this decision has

the right to file a civil action in either Federal District Court or a State Court of competent

jurisdiction, pursuant to the Individuals with Disabilities Education Act, within ninety (90)

days after the date on which the Hearing Officer's Decision is filed with the Arkansas

Department of Education.

Pursuant to Section 10.01.36.5, *Special Education and Related Services: Procedural*

*Requirements and Program Standards,* Arkansas Department of Education 2008, the

Hearing Officer has no further jurisdiction over the parties to the hearing.

### IT IS SO ORDERED.


/s/ Debby Linton Ferguson
_____

**HEARING OFFICER**

11/27/2024
_____

**DATE**

**ARKANSAS DEPARTMENT OF EDUCATION**
**Special Education Unit**

IN RE:

| | |
|---|---|
| **Kevin and Judy Hoggard,** Parents of<br>Alexander Hoggard, Student | **PETITIONER** |
| VS.            CASE NO. H-25-37 | |
| **Pulaski County Special School District,**<br>District | **RESPONDENT** |

## ORDER GRANTING MOTION TO DISMISS

1.  On March 28, 2025, Petitioner filed a request for a due process hearing pursuant to the Individuals with Disabilities in Education Act ("IDEA"). The applicable timelines for the due process hearing commenced on April 27, 2025. At the prehearing conference held Friday, May 2, 2025, at 11:00 a.m., the parties agreed on the record to continue the hearing dates to May 6-8, 2025.

2.  Prior to taking any testimony, counsel for each party presented arguments on the record regarding whether tuition reimbursement was a possible remedy if a student's private school tuition was being partially or fully funded pursuant to Arkansas' Learns Act. The District stated it was unaware that the student's education was partially or fully funded pursuant to the Learns Act on Thursday, May 1, 2025 and requested a subpoena for an individual to bring records. This Hearing Officer issued the subpoena on Sunday, May 4, 2025. The District further requested a continuance in order to allow time to obtain the documents and present this Hearing Officer with a motion and brief on the issue. Parent objected to the continuance on the grounds that the information received would not be relevant to the provision of FAPE to the Student pursuant to IDEA. This Hearing Officer granted the continuance for good cause shown and as there could be potential prejudice to the District if not permitted time to obtain documents and brief the issue but no prejudice to the Parent as the Student's private school tuition was paid through December of 2025, as stated on the record. In addition, this Hearing Officer ordered the District to provide a motion and brief on the issue outlined above and for the Parent to provide a written response, and both parties did so. The hearing was rescheduled for June 24-26, 2025.

3.  Attached to its pre-trial brief, the District proffered Student's Educational Freedom Account ("EFA") Application for the 2024-2025 school year and Student's EFA funding information reflecting that Compass Academy was paid $3,364.24 from EFA funding for Student's

Exhibit B

education from January to March of 2025, the timeframe at issue in this matter. Additionally, the District attached Parent's EFA Waiver Form, signed April 26, 2024, which acknowledged that:

> [t]he State of Arkansas is under no obligation to provide services or education to the [children listed] except for funding provided specifically for the Education Freedom Account Program during the time [Parent] chooses to enroll [his] children in private school; . . . the resident school district is under no obligation to provide services or education to the [children listed] except for services that may or may not be provided to other private school students as part of the district's regular obligations under the Individuals with Disabilities Education Act, 20 U.S.C. §1400 et seq., during the time the parent or guardian chooses to enroll their children in private school.

The District argued that Student was parentally placed in private school and therefore does not have an enforceable right to an individualized educational program ("IEP") or tuition reimbursement pursuant to 20 U.S.C §1412(a)(10)(C); 34 C.F.R. §300.137(a).

4.  Parents asserted that A.C.A. § 6-18-2506 does not include a requirement that parents waive IDEA rights and that A.C.A. § 6-41-904(a)(4), (5) requiring parents to sign a waiver of IDEA rights had been repealed. In addition, Parents argued they did not knowingly waive Student's rights pursuant to IDEA and therefore did not waive Student's rights pursuant to IDEA.

5.  Based on the record, pretrial briefs, and documents proffered, the following facts are undisputed:

    a.  In H-24-48, this Hearing Officer found that the District denied Student FAPE between January 9, 2024 and May 23, 2024 and that Compass Academy was an appropriate placement for Student, and this Hearing Officer granted the request for placement at Compass Academy and ordered reimbursement of one year's tuition through December 31, 2024. The issue of Student receiving EFA funds was not raised in the prior hearings regarding Student, and this hearing officer had no knowledge that Student received EFA funds or the implications of his receiving EFA funds prior to the District raising it in this matter.

    b.  On or about, April 26, 2024, Parent signed the Education Freedom Accounts Waiver Form stating: the resident school district is under no obligation to provide services or education to the [children listed] except for services that may or may not be provided to other private school students as part of the district's regular obligations under the Individuals with Disabilities Education Act, 20 U.S.C. 1400 et seq.," during the time Parent chooses to enroll Student in private school. In signing the EFA funding waiver, Parent acknowledged he was knowingly and willingly signing the waiver.

    c.  Student has attended Compass Academy, a private school placement, from the beginning of the timeframe at issue in this matter of January 1, 2025 and continues to attend there to this date.

    d.  Compass Academy received EFA funds paying for Student's private school education from January of 2025 through December of 2025.

7.    Based on the undisputed facts listed above, this Hearing Officer finds that:

    a.  Student was parentally placed at Compass Academy during the time at issue in this matter, between January 1, 2025 to March 28, 2025.

    b.  As Student was parentally placed at Compass Academy during the time at issue in this matter, the District was not obligated to provide services or education to Student except for services that may or may not be provided to other private school students as part of the District's regular obligations under the Individuals with Disabilities Education Act, during the time Parent chose to enroll Student in private school, and the due process provisions in Section 615 of the IDEA and 34 C.F.R. §§300.504 through 300.519 do not apply. *See also* 20 U.S.C. § 1400 et seq.; OSEP QA 22-01 at p. 39, 53; and 34 C.F.R. 300.137(a).

    c.  Further, the requested remedies in this matter are tuition and transportation reimbursement, and Student's tuition during the timeframe at issue has been paid for by EFA funding.

8.    As there are no issues falling within this Hearing Officer's jurisdiction or authority relative to the IDEA, this Hearing Officer hereby dismisses this matter without prejudice pursuant to Arkansas Department of Education Special Education and Related Services 10.00 Mediation and Hearings, Effective date: February 9, 2024, Section 10.20.2. *See also Niehaus v. Huppenthal*, 233 Ariz. 195, 201, 310 P.3d 983, 989 (Ct. App. 2013). However, this dismissal should not be construed as a finding that Parents or their attorney acted in bad faith or with intent to violate any laws or regulations, particularly in light of prior orders and this new issue of law in this jurisdiction.

**IT IS SO ORDERED.**

**/s/ Debby Ferguson, Hearing Officer**
**Date: 6/20/2025**

**Outlook**

~~Activity in Case 4:23-cv-01194-LPR Doe v. Vilonia School District Order on Motion to Unseal~~
Document

**From** ecf_support@ared.uscourts.gov <ecf_support@ared.uscourts.gov>
**Date** Wed 7/30/2025 4:33 PM
**To** ared_ecf@ared.uscourts.gov <ared_ecf@ared.uscourts.gov>

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT
RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits
attorneys of record and parties in a case (including pro se litigants) to receive one free
electronic copy of all documents filed electronically, if receipt is required by law or directed by
the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of
each document during this first viewing. However, if the referenced document is a transcript,
the free copy and 30 page limit do not apply.

### U.S. District Court

### Eastern District of Arkansas

**Notice of Electronic Filing**

The following transaction was entered on 7/30/2025 at 4:31 PM CDT and filed on 7/30/2025
**Case Name:** Doe v. Vilonia School District
**Case Number:** 4:23-cv-01194-LPR
**Filer:**
**Document Number:** 31(No document attached)

**Docket Text:**
**(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.)**
**ORDER granting [30] Motion to Unseal Doc. 25. Vilonia School District has told the Court**
**that it does not oppose the Motion. Signed by Judge Lee P. Rudofsky on 07/30/2025.**
**(snb)**

**4:23-cv-01194-LPR Notice has been electronically mailed to:**

George Jay Bequette, Jr    jbequette@bbpalaw.com, fdurham@bbpalaw.com, qcooley@bbpalaw.com,
msadler@bbpalaw.com
                                                                    **Exhibit C**

John Clayburn Fendley, Jr    clay@specedattorney.com

Theresa Lynn Caldwell    tlcatty@gmail.com, clay@specedattorney.com, darlene@specedattorney.com,
theresa@specedattorney.com

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 3 1 2025

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

T.R.                                                                    **PLAINTIFF**

v.                                  Case No. 4:23-cv-01194-LPR

**VILONIA SCHOOL DISTRICT**                              **DEFENDANT**

## SEALED ORDER

This is a special education case.  Plaintiff T.R. is the parent of D.D., a 17-year-old minor who has been diagnosed with autism spectrum disorder and is nonverbal.[1]  D.D. currently attends Compass Academy, where D.D. receives special education services.[2]  But before attending Compass Academy, D.D. was enrolled at Defendant Vilonia School District.[3]  Much of this case is related to the time during which D.D. attended the Vilonia School District.

As a general matter, T.R. believed that the District was not living up to its obligations under the Individuals with Disabilities Education Act (IDEA).  Putting aside the particulars for now, T.R. believed that the District's failings unlawfully denied D.D. a Free Appropriate Public Education (FAPE).[4]  T.R. challenged the District's actions by way of two Due Process Complaints filed with the Arkansas Department of Education.[5]  These two Due Process Complaints led to two Administrative Decisions.[6]  The minutiae of the Administrative Decisions are complicated and will be laid out in more detail below.  But the gist is that the Administrative Hearing Officer concluded

---

[1] Administrative R. (Doc. 14) at 1157–58.

[2] *Id.* at 366.

[3] *Id.* at 187–88.

[4] *Id.* at 1–18, 2452–64.

[5] *Id.*

[6] *Id.* at 121–55, 2551–77.

25

as follows: D.D. was denied a FAPE in the 2021–2022 and 2022–2023 school years;[7] the District would be unable to provide D.D. a FAPE for the 2022–2023 and 2023–2024 school years;[8] and Compass Academy was an appropriate educational placement for D.D. for those years.[9]

The IDEA provides that a parent who prevails at the administrative decision level can file a lawsuit in federal court seeking reimbursement for the costs and attorneys' fees that the parent incurred pursuing administrative remedies.[10] Relying on this provision of the IDEA, T.R. filed the instant lawsuit for the costs and attorneys' fees that T.R. incurred pursuing administrative remedies.[11] Along with its Answer to T.R.'s Complaint, the District filed a Counterclaim against T.R.[12] As that Counterclaim notes, the IDEA allows a party that lost (in whole or in part) at the administrative decision level to bring an action seeking to overturn the decision or decisions of the administrative hearing officer.[13] Relying on this provision of the IDEA, the District asks this Court to "revers[e] the decision of the hearing officer on all claims in which the hearing officer ruled in favor of [T.R.]" and to award the District "attorneys' fees and costs incurred herein . . . ."[14]

When a party files an original action in federal district court seeking review of an administrative decision under the IDEA, the reviewing court must consider all evidence included in the administrative record.[15] The court must also allow the parties a chance to present additional

---

[7] *Id.* at 145–49, 2571.

[8] *Id.* at 2574.

[9] *Id.* at 2575.

[10] 20 U.S.C. § 1415(i)(3).

[11] *See* Compl. (Doc. 1).

[12] *See* Answer (Doc. 6) ¶¶ 29–38.

[13] *See* 20 U.S.C. § 1415(i)(2)(A); *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011).

[14] Answer (Doc. 6) at 7.  Despite its surface-level similarities to an appeal, the action brought by the District is an original civil action. *See Paris Sch. Dist. v. Harter*, 894 F.3d 885, 887 n.3 (8th Cir. 2018).

[15] *See* 20 U.S.C. § 1415(i)(2)(C)(i).

evidence for the court's consideration.[16]  After reviewing all the evidence, the court must (1) make an independent decision, based on a preponderance of the evidence, and (2) grant the relief that "the court determines is appropriate."[17]  Still, federal district courts do not review these matters entirely *de novo*.[18]  Courts—at least courts in the Eighth Circuit—must give the hearing officer's administrative decision "due weight."[19]

Pending before the Court are the parties' cross-Motions for Judgment on the Record with respect to the District's Counterclaim.[20]  The record in this case consists of the two Administrative Decisions and the pleadings and records from both administrative proceedings.  After a careful and close independent review of the entire record—but one that takes into account the "due weight" owed to the Administrative Hearing Officer—the Court GRANTS IN PART and DENIES IN PART both Motions for Judgment on the Record.[21]  Below, the Court provides its findings of fact and conclusions of law.

A.    **Facts Leading up to D.D.'s Move to Vilonia High School**

D.D. is currently 17 years old.[22]  D.D. is diagnosed with autism spectrum disorder and is nonverbal.[23]  D.D. has substantial trouble communicating, and he has difficulties with both behavior and attention.[24]  D.D. requires special education and is a covered student under the

---

[16] *See* 20 U.S.C. § 1415(i)(2)(C)(ii).  In this case, neither party chose to supplement the administrative record.

[17] 20 U.S.C. § 1415(i)(2)(C)(iii).

[18] *See Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015).

[19] *See id.*

[20] Def.'s Mot. for J. on the R. (Doc. 15); Pl.'s Mot. for J. on the R. (Doc. 17).

[21] Def.'s Mot. for J. on the R. (Doc. 15); Pl.'s Mot. for J. on the R. (Doc. 17).

[22] Administrative R. (Doc. 14) at 2259 (listing D.D.'s date of birth).

[23] *Id.* at 1157–58.

[24] *Id.* at 125; *see also id.* at 1493–94.

IDEA.[25]  As part of its duty to provide a FAPE to children with disabilities, the school district in which D.D. resides is required to develop an Individualized Education Program (IEP) for each year that D.D. attends school.[26]  D.D. attended Vilonia School District from 1st grade until 9th grade.[27]  For purposes of the present case, however, we can pick up the timeline shortly before D.D. entered 8th grade at Vilonia Middle School.

On April 2, 2020, as D.D.'s 7th-grade school year was nearing completion, the District held an annual IEP review meeting to develop an IEP for D.D.'s 8th-grade school year (2020–2021).[28] The IEP included a statement of D.D.'s then-current level of academic achievement.[29]  D.D., at that time, performed below grade level in all areas.[30]  The IEP stated that D.D. required the assistance of an iPad installed with Proloquo2Go (a communication application) to communicate with educators.[31]  The IEP also stated that D.D. needed a one-on-one paraprofessional to supervise and assist D.D. throughout the school day.[32]  Under the IEP, D.D. was to receive 30 minutes of speech therapy weekly.[33]  And D.D. was to receive 1.5 hours of instruction, four times a week, in each of functional literacy, functional math, and daily living skills.[34]  The IEP also included a

---

[25] *See* 20 U.S.C. § 1401(3)(A).

[26] *See* 20 U.S.C. § 1412(a)(4); 20 U.S.C. § 1414(d)(4)(A)(i).

[27] Administrative R. (Doc. 14) at 187–88, 1157.

[28] *Id.* at 1587–88.

[29] *Id.* at 1592–93.

[30] *Id.* at 1592.

[31] *Id.* at 1592–93.

[32] *Id.* at 1592.  Holly McCord has worked as D.D.'s personal one-on-one paraprofessional since the 4th grade.  *Id.* at 708–09.

[33] *Id.* at 1595.

[34] *Id.*

statement of measurable annual goals.[35]  Among these were annual goals for English, math, and science.[36]  The IEP also had a career goal and an activities-of-daily-living goal.[37]

The foregoing is really just stage-setting information.  Although T.R.'s First Due Process Complaint to the Arkansas Department of Education (in August of 2022) included concerns about D.D.'s 8th-grade year, T.R. eventually dropped that part of the Due Process Complaint.[38]  T.R. persisted, however, with T.R.'s concerns about D.D.'s 9th-grade year (and beyond).  So it is to those years that we now turn.

On May 21, 2021, as D.D.'s 8th-grade school year was nearing completion, the District held an annual IEP review to discuss D.D.'s progress during the 8th-grade year (2020–2021) and to develop an IEP for D.D.'s 9th-grade year (2021–2022).[39]  Although all IEP meetings are important, this one might be considered particularly important.  That is because—since D.D. had made good progress on previously-set goals and showed improvements in several areas[40]—D.D. would be moving (just like all the other rising 9th graders) from Vilonia Middle School to Vilonia High School.[41]

The 9th-grade IEP was fashioned at this May 21, 2021 meeting, although it was later refined at a September 9, 2021 meeting that will be discussed below.  Like the 8th-grade IEP, the 9th-grade IEP included a statement describing D.D.'s current academic achievement, a statement of measurable goals, and a statement of the special education and related services to be provided

---

[35] *Id.* at 1597–1603.

[36] *Id.*

[37] *Id.* at 1601–02.

[38] *Id.* at 13–14, 1340–41.

[39] *Id.* at 2104–25.

[40] *Id.* at 2104.

[41] *See id.* at 1171–72.

to D.D.[42]  D.D. was to receive instruction in literacy, math, science, social studies, and transition studies.[43]  D.D. was to receive 15 minutes of speech therapy 12 times a month.[44]  And D.D. was to receive 30 minutes of consultative occupational therapy once a month.[45]  The 9th-grade IEP included one speech therapy goal, one math goal, one English goal, one science goal, one social studies goal, and one life skills goal.[46]  The IEP included a requirement for a one-on-one paraprofessional.[47]  And the IEP listed, among other things, a sensory area as part of the "[p]ositive behavioral interventions and supports and other strategies to address [D.D.'s] behavior."[48]

**B.    D.D.'s 9th-Grade Year at Vilonia High School (2021–2022)**

As planned, D.D. started the 2021–2022 school year at Vilonia High School.[49] Unfortunately, problems arose almost immediately—including D.D. having multiple meltdowns.[50] Symptoms associated with these "meltdowns" included D.D. slapping D.D.'s back, biting D.D.'s hands, making noises, and contorting D.D.'s face.[51]  Shortly after the start of the year, T.R. called

---

[42] *Id.* at 2104–18 (May 21, 2021 IEP); *id.* at 2127–39 (September 9, 2021 IEP).

[43] *Id.* at 2117–18 (May 21, 2021 IEP); *id.* at 2139 (September 9, 2021 IEP) (calling these subjects English Exploration, Math Exploration, Science Exploration, Civics Exploration, Workplace Readiness, and Life Skills).

[44] *Id.* at 2117 (May 21, 2021 IEP); *id.* at 2139 (September 9, 2021 IEP).

[45] *Id.* at 2139 (September 9, 2021 IEP).  This occupational therapy service did not appear in the May 21, 2021 IEP. *See id.* at 2117 (May 21, 2021 IEP).

[46] *Id.* at 2106–11 (May 21, 2021 IEP); *id.* at 2136–38 (September 9, 2021 IEP).  Unlike the September 9, 2021 IEP, the May 21, 2021 IEP did not have a speech therapy goal.  And, unlike the May 21, 2021 IEP, the September 9, 2021 IEP did not have a career goal.  Those were not the only differences between the IEPs.  Compared to the May 21, 2021 IEP, some of the academic goals in the September 9, 2021 IEP appear to be significantly watered down.  That is, a few of the academic goals in the May 21, 2021 IEP are missing from the September 9, 2021 IEP—seemingly exchanged for easier and less academically-oriented goals. *Compare id.* at 2106–11, *with id.* at 2136–38; *see also id.* at 2249–51, 2255–56.

[47] *Id.* at 2117 (May 21, 2021 IEP); *id.* at 2134 (September 9, 2021 IEP).

[48] *Id.* at 2114 (May 21, 2021 IEP); *id.* at 2129, 2134 (September 9, 2021 IEP).  The September 9, 2021 IEP described the sensory area requirement a little differently than the May 21, 2021 IEP.  The September 9, 2021 IEP said that "[t]aking a break includes access to a quiet break area away from peers." *Id.* at 2129.

[49] *Id.* at 1171.

[50] *See id.* at 729–30, 813–15, 1173–75.

[51] *Id.* at 728.

6

for an IEP meeting to, *inter alia*, address T.R.'s concerns with the "sensory area" that was supposed to prevent or mitigate these meltdowns.[52]

A sensory area is a calm, quiet place without much stimuli where a paraprofessional can take a student to (1) help prevent a meltdown in the first place, or (2) soothe the student and thus end a meltdown already in progress.[53] D.D. had trouble adjusting to Vilonia High School and used the sensory area often at the beginning of the school year.[54] T.R. believed the High School's sensory area to be inadequate.[55] T.R. was not satisfied with the sensory area because T.R. was concerned that the area was not private and that D.D. wouldn't be able to calm down if D.D. felt like D.D. was being watched by other students.[56]

An IEP meeting was set for September 9, 2021 to discuss T.R.'s concern.[57] It appears that this meeting did not result in any substantive changes to the sensory area.[58] But there were some actions taken to help D.D. as a result of this meeting.[59] D.D.'s occupational therapist developed a list of activities and resources for D.D. to utilize prior to becoming upset.[60] It was agreed that D.D.

---

[52] *Id.* at 1175.

[53] *Id.* at 728–29, 810.

[54] *See id.* at 729–30, 813–14.

[55] *See id.* at 1189–90. At Vilonia Middle School, the sensory area was its own separate room. *See id.* at 809. In the room was a five-foot-by-five-foot crash pad, sensory toys, stuffed animals, dim lighting, and a curtain covering the wall. *Id.* The room created a soothing environment where the student could calm down. *See id.* at 809–10. At Vilonia High School, however, there was no separate sensory room. *Id.* at 812. Instead, there was a sensory "area" located in the corner of one of the special education classrooms. *Id.* A partition was used to separate the sensory area from the rest of that classroom. *Id.* at 813. In the sensory area was a crash pad and a box of toys. *Id.*

[56] *Id.* at 1189–90.

[57] *Id.* at 1175, 2127–42.

[58] *Id.* at 2127–42.

[59] *Id.* at 2127.

[60] *Id.*

7

would have sensory breaks built into D.D.'s schedule.[61]    And a revised IEP was issued.[62] Additionally, a transition plan was developed (or at least began to be developed) for D.D. at the meeting.[63]  As part of this planning, T.R. explained that T.R. wanted D.D.'s education to focus on life and job skills more than on academics.[64]

Apparently, the September 9, 2021 meeting and subsequent steps taken by the District did not assuage T.R.'s concerns.  On September 20, 2021, T.R. filed a state complaint with the Arkansas Department of Education, alleging that the District had violated D.D.'s IEP in a variety of ways.[65]  The alleged violations included a failure to provide appropriate speech services, a failure to provide a sensory room, a failure to support the removal of academic goals with data, a failure to provide a one-on-one paraprofessional, and a failure to adhere to the schedule of services.[66]

It is worth noting that this complaint is not one of the two Due Process Complaints that underlie the instant case. Rather, here we deal with a separate process that triggers an investigation by the Arkansas Department of Education.[67]  After conducting the necessary investigation, the Arkansas Department of Education issued a report.[68]  The report found that the District (1) did not fail to provide a sufficient sensory area, (2) did not fail to provide a one-on-one paraprofessional,

---

[61] *Id.*

[62] *Id.* at 2127–42.

[63] *Id.* at 2127, 2132, 2158–67.

[64] *Id.* at 2127, 2163.

[65] *Id.* at 2204–10.

[66] *Id.* at 2243.

[67] *See id.* at 2243–44.

[68] *Id.* at 2241–58.

8

and (3) did not fail to adhere to the schedule of services.[69]   Still, the report made two findings against the District.

First, the Department found that the District's May 21, 2021 IEP failed to provide for appropriate speech services.[70]  But the Department noted that the September 9, 2021 IEP had fixed the problem and so no further corrective action was necessary.[71]  Second, the Department found that the District failed to support with data the September 9, 2021 IEP's removal of certain academic goals from the May 21, 2021 IEP.[72]  To remedy this problem, the Department instructed the District to gather data regarding D.D.'s academic needs and to revise D.D.'s goals based on that data.[73]  The District was given a deadline of December 16, 2021, to accomplish this.[74]

On December 8, 2021, the District held another IEP meeting and developed a new version of D.D.'s IEP.[75]  D.D.'s performance through the school year to that point was discussed, and D.D.'s IEP goals were updated.[76]  In part to reflect that D.D. was no longer working toward graduation based on credits,[77]  D.D.'s schedule of services was changed to include recreation/leisure, vocational skills, domestic skills, functional academics, community skills, speech therapy, and a one-on-one paraprofessional.[78]

---

[69] *Id.* at 2255–56.

[70] *Id.* at 2244–47, 2254–55.

[71] *Id.* at 2254–55; *see also supra* note 46.

[72] Administrative R. (Doc. 14) at 2249–51, 2255–56.

[73] *Id.* at 2255–56.

[74] *Id.* at 2256.

[75] *Id.* at 2259–77.

[76] *Id.* at 2261–73.

[77] T.R. requested that D.D. be able to graduate based on meeting D.D.'s IEP goals rather than on academic credits. *Id.* at 2259, 2311–12.

[78] *Id.* at 2274.  At this meeting, it was also agreed that District staff would get additional training on Proloquo2Go (the communication system that D.D. uses).  *Id.* at 2259, 2312.

In this meeting, the District's attendance policy—and its applicability or inapplicability to D.D.—was discussed.[79]  T.R. requested that D.D. not be required to adhere to the District's attendance policy.[80]  The IEP developed at the December 8, 2021 meeting explains as follows:

> [D.D.'s] Annual Review listed that [D.D.] will not follow discipline and attendance. [T.R.] stated that[,] because [D.D.] cannot comprehend the handbook policy[,] [D.D.] should not follow the handbook policy.  The committee discussed coming up with specific expectations related to discipline and attendance.  In relation to attendance[,] if [D.D.] stays at home due to sickness[,] [T.R.] will notify the teacher and [D.D.'s] absences will be excused.  If [self-injurious behavior (SIB)] or incidents of crying occur for longer than 10 minutes[,] the Nurse will be contacted to administer medication provided by the parent.  [T.R.] will be notified by the classroom teacher that medication was administered.  If the SIBs continue for 15 minutes after medication[,] [T.R.] will be notified.  [T.R.] will determine if [T.R.] will pick [up D.D.] based on the communication with staff.  If [D.D.] goes home[,] the absence will be excused due to medical.[81]

Finally, at the December 8, 2021 meeting, District staff explained that D.D. was still displaying self-injurious behavior.[82]  Whether a Functional Behavior Assessment (FBA) would be conducted to assist in addressing those behaviors was discussed but not resolved.[83]

On January 10, 2022, yet another IEP meeting was held to discuss and revise the IEP that was developed at the previous meeting.[84]  The procedure for dropping off and picking up D.D. from school was discussed.[85]  It was agreed that D.D. could be dropped off and picked up at an alternate location on school grounds because D.D. would get overstimulated around large groups.[86]

---

[79] *See id.* at 2259, 2312.

[80] *Id.*

[81] *Id.* at 2259.

[82] *Id.* at 2311.

[83] *Id.*  At an earlier meeting (on October 7, 2021), T.R. had apparently given consent for an FBA.  *Id.*  But, at some point, T.R. had withdrawn this consent.  *Id.*

[84] *Id.* at 2319–38.

[85] *Id.* at 2337.

[86] *Id.*

Also discussed was the FBA.[87]  Indeed, it was at this meeting that T.R. finally consented to the

FBA.[88]  Lastly, the IEP team and T.R. agreed to a communication plan.

> If [T.R.] has a concern[,] [T.R.] will notify the special education teacher, the special
> education director, and any additional staff member necessary related to the
> concern.  Staff will have two business days to respond to the email.  If staff have
> concerns and aren't comfortable addressing it with [T.R.,] they will notify the
> special education director to schedule a meeting with [T.R.].[89]

On March 4, 2022, the IEP team met with T.R. to discuss D.D.'s FBA and a proposed

Behavior Intervention Plan (BIP).[90]  The FBA and the BIP were developed to identify and address

D.D.'s disruptive behaviors.[91]  The disruptive behaviors included self-injury, throwing objects, and

task avoidance.[92]  The IEP team determined that it would implement the BIP.[93]  As a result, several

new behavior goals were added to D.D.'s IEP.[94]  These included (1) "go[ing] 10 consecutive

sessions with no more than 3 occurrences of SIB"; (2) "go[ing] five consecutive sessions with no

more than two occurrences of throwing objects"; and (3) successfully "transitioning from a highly

preferred activity to a lesser preferred activity[.]"[95]  T.R. left this meeting early and thus did not

engage in the entire meeting.[96]  T.R. was upset because T.R. felt like the IEP team was not listening

to T.R.'s concerns about the FBA, the BIP, and the proposed new goals.[97]

---

[87] *Id.*

[88] *Id.* at 2337, 2339–40.

[89] *Id.* at 2327.

[90] *Id.* at 2341, 2359–60.

[91] *See id.* at 2359.

[92] *Id.*

[93] *Id.* at 1258.

[94] *Id.* at 2351.

[95] *Id.*

[96] *See id.* at 2360.

[97] *See id.* at 1249–59, 2359–60, 2970–71.

One should be able to intuit from the foregoing that there was—to be polite about it—some tension between the District staff (especially the staff at Vilonia High School) and T.R. with respect to D.D.'s education, behavior, and overall experience at Vilonia High School. That tension was about to come to a head, as explained further below. But before moving to the climax of all this tension, it is worth noting one additional point of contention: the abilities (or lack of abilities) of D.D.'s special education class teacher, Keith Renuard.[98] Mr. Renuard was a first-year teacher who had not yet received his master's degree in special education.[99] According to the testimony of D.D.'s one-on-one paraprofessional (Ms. McCord),[100] the class lacked structure and appropriate instruction.[101] Indeed, based on Mr. Renuard's own testimony, the Hearing Officer concluded that Mr. Renuard was overwhelmed with his teaching tasks.[102] There was little teaching occurring throughout the day,[103] and the little teaching that did occur was often done by paraprofessionals instead of qualified teachers.[104]

## C.    D.D.'s Time at Vilonia High School Comes to an End

In March of 2022, D.D. was absent from school for multiple weeks because of a double ear infection.[105] While D.D. was out sick, D.D.'s one-on-one paraprofessional, Holly McCord, was reassigned to a different school.[106] She was supposed to return to Vilonia High School once

---

[98] *Id.* at 410–11.

[99] *Id.* at 411–12.

[100] The Hearing Officer found Ms. McCord's testimony to be credible. *Id.* at 146. The Court has no reason to conclude otherwise.

[101] *See id.* at 146, 732, 735, 758–61.

[102] *Id.* at 146; *see also id.* at 419–20.

[103] *See id.* at 1919–26.

[104] *Id.* at 758–61. It also appears that instructors were not sufficiently trained on D.D.'s communication device and Proloquo2Go. *Id.* at 736.

[105] *Id.* at 1276.

[106] *Id.* at 234–35, 500, 863–64.

D.D. returned to school.[107] That makes perfect sense. Recall that every version of D.D.'s IEP required a one-on-one paraprofessional to assist D.D. during the school day.[108]

Unfortunately, it appears that Ms. McCord was not reassigned back to Vilonia High School when D.D. was ready to return to school.[109] On the morning of March 29, 2022, T.R. attempted to drop off D.D. at Vilonia High School at the normal (i.e., alternate) drop-off location.[110] The evidence suggests that, at this time, T.R. already knew that Ms. McCord was not going to be there.[111] T.R. audio-recorded the events of that morning on T.R.'s phone, and the recording is in the record at page 1,927 of the Administrative Record. Although the Court will summarize the events captured on the recording, a reviewing court would be well-served to listen to the recording in full. The participants' escalating tones of voice, manners of speaking, biting remarks, and (eventually) raised voices are consistent with people who have reached their tipping points of exasperation.[112]

When T.R. pulled up to the school, a woman named Amber Canitz opened a building door approximately 100 yards away.[113] Ms. Canitz was one of the paraprofessionals in Mr. Renuard's classroom.[114] But there is no evidence to suggest that she was a dedicated one-on-one paraprofessional for D.D. alone.[115] Ms. Canitz remained at or near the open door, so T.R. called

---

[107] *Id.* at 864.

[108] *Id.* at 2114, 2134, 2268, 2327, 2349.

[109] *Id.* at 865.

[110] *Id.* at 1282. There is a disagreement as to whether the drop-off occurred in the appropriate alternate location. *See* Mar. 29, 2022 Recording at 0:03:33–50. But that dispute is not relevant to the outcome of this case.

[111] Administrative R. (Doc. 14) at 1283.

[112] *See generally* Mar. 29, 2022 Recording.

[113] Administrative R. (Doc. 14) at 1282.

[114] *Id.*

[115] *See id.* at 510–11.

out to her from T.R.'s car.[116]   Specifically, T.R. asked Ms. Canitz if Mr. Renuard (the special

education teacher) could come outside or if T.R. could otherwise speak to Mr. Renuard before T.R.

left D.D. at school.[117]   T.R. explained that T.R. needed to speak to Mr. Renuard before dropping

off D.D. because D.D. was taking a new medication.[118]   T.R. wanted to tell Mr. Renuard which

side effects might result from the medication so he could be on the lookout for them.[119]

At that point, Ms. Canitz went back inside.[120]   She must have informed the High School

principal, Ronnie Simmons, of T.R.'s request (or at least T.R.'s presence) because, after a couple

of minutes, Mr. Simmons came outside to speak with T.R.[121]   Mr. Simmons asked T.R. if there was

a medicine issue, and T.R. explained that D.D. was taking a new medication.[122]   Mr. Simmons told

T.R. that T.R. needed to speak with the school nurse about any medicine issues, including potential

side effects.[123]   T.R. said that T.R. also wanted to speak to Mr. Renuard—because T.R. felt the

teacher and classroom paraprofessionals needed to know about the potential side effects too.[124]   It

seems the disagreement here boils down to Mr. Simmons' view that the proper protocol was for

T.R. to inform the nurse of the side effects (and then the nurse would discuss the side effects with

Mr. Renuard and the classroom paraprofessionals) versus T.R.'s view that T.R. should directly

inform Mr. Renuard and the paraprofessionals about the potential side effects of the new medicine.

---

[116] *Id.* at 1282.

[117] Mar. 29, 2022 Recording at 0:00:05–21.

[118] Administrative R. (Doc. 14) at 1283.

[119] *Id.*

[120] *Id.*

[121] *Id.*

[122] Mar. 29, 2022 Recording at 0:02:42–48.

[123] *Id.* at 0:02:48–0:03:01.

[124] *Id.* at 0:03:01–10.

14

Eventually, T.R. agreed to speak with the nurse "after [T.R.] dropp[ed] [D.D.] off."[125] It appears, at this point, that T.R.'s intent was to walk D.D. into the school and to Mr. Renuard's classroom. Principal Simmons' response was "[D.D.] can walk in[,]" suggesting that T.R. should not accompany D.D. into the school.[126] This response seems to have aroused T.R.'s suspicion that something was off. And, as noted above, T.R. already knew Ms. McCord was not there.[127] T.R. said, "well, no, I need to talk to [Mr. Renuard] to make sure [D.D.'s] got a -- does [D.D.] have . . . a one-on-one para?"[128] Mr. Simmons' response can only be described as evasive: "Mr. Renuard has a classroom, everything's taken care of."[129] T.R. was not satisfied with that answer. T.R. said that T.R. "can't leave [D.D.] at school unless [D.D.] has a one-on-one para."[130] Mr. Simmons then said, "okay, well then you can just take [D.D.] on home."[131]

T.R. did just that,[132] but not before exchanging additional words with Mr. Simmons. T.R. said, "Okay, you guys are denying [D.D.] FAPE, and I'm going to document this."[133] Mr. Simmons disagreed, saying, "no, that's not right."[134] T.R. responded, "yeah, it's in [D.D.'s] IEP. [D.D.] has to have a one-on-one para."[135] Mr. Simmons explained his position: "You said you're not leaving [D.D.], and I told you [D.D.'s] taken care of."[136] T.R. interjected something about D.D. needing

---

[125] *Id.* at 0:03:01–05.

[126] *Id.* at 0:03:05–06.

[127] *See* Administrative R. (Doc. 14) at 1282.

[128] Mar. 29, 2022 Recording at 0:03:06–10.

[129] *Id.* at 0:03:10–14.

[130] *Id.* at 0:03:14–16.

[131] *Id.* at 0:03:16–18.

[132] Administrative R. (Doc. 14) at 1287.

[133] Mar. 29, 2022 Recording at 0:03:17–21.

[134] *Id.* at 0:03:19–21.

[135] *Id.* at 0:03:21–23.

[136] *Id.* at 0:03:23–27.

to be escorted inside by a one-on-one paraprofessional.[137]  During this exchange, Mr. Simmons never said that there was a one-on-one paraprofessional for D.D.  The conversation then devolved into bickering about another issue and, very shortly thereafter, abruptly ended with Mr. Simmons walking away.[138]  Some of what was said at this point is inaudible.  What is audible as the conversation closes out is a ridiculous spat about who is recording whom and whom the recording(s) will help.[139]

Thereafter, T.R. refused to bring D.D. to school because (1) T.R. was not comfortable with the implementation of the BIP, and (2) T.R. was unsure D.D. would be given a one-on-one paraprofessional and, if so, who that would be.[140]  On April 4, 2022, T.R. wrote an email to the special education director for the School District.  T.R.'s email summarizes the March 29 event and T.R.'s then-current concerns:

> This is my written documentation of the incident that happened on the morning of March 29th while attempting to drop [D.D.] off at school.
>
> [D.D.] has been out sick the week of March 7 and the week of March 14.  March 28 [D.D.] had a psych appointment.  (See doctor notes attached for proof of excused absences.)  [D.D.] was prescribed a new anxiety medication on March 28 to help [D.D.] cope with everything that has been going on at school.  [D.D.'s] doctor stressed to me the importance of being able to recognize side effects and specific changes that would warrant an immediate call to her so it can be determined if the medication needs to be reduced or stopped.  Someone would have to be familiar with [D.D.] to be able to quickly and easily recognize side effects associated with this medication.  In the past[,] I knew I could easily recognize side effects associated with this medication.  In the past[,] I knew I could relay this information to [D.D.'s] 1:1 para or teacher and trust that I would be notified immediately if they noticed anything concerning.  While [D.D.] was out sick, [D.D.'s] 1:1 para was transferred to another school.  I was not notified of this.  I had to find out from multiple members in my community.  At this point[,] I do not know if [D.D.] still has a 1:1 or has been assigned someone else to be [D.D.'s] 1:1.  I am not able to tell [D.D.]

---

[137] *Id.* at 0:03:28–31.

[138] *Id.* at 0:03:31–52.

[139] *Id.* at 0:03:55–0:04:30.

[140] Administrative R. (Doc. 14) at 1294–97, 2972–73.

what's going on to prepare [D.D.] for the fact that [D.D.'s] regular para is gone or even tell [D.D.] if [D.D.] will have a new para or who that will be. It is well known and documented that [D.D.] is routine oriented and [D.D.] has a very good relationship with [D.D.'s] para and this will cause extreme anxiety. It is very concerning that no one thought it was important to communicate this to me so I could help prepare [D.D.] for the changes.

The morning of March 29, I pulled up to drop [D.D.] off at school the same way I've dropped [D.D.] off everyday since August, the entire school year. I text [Mr. Renuard] that [D.D.'s] here. No response. A few minutes later[,] one of the classroom paras opens the building door[,] which is approximately 100 feet from the parking lot[,] and she stands there holding the door open. I'm not quite sure what's going on at this point because [D.D.'s] 1:1 para has always walked out to come escort [D.D.] to [D.D.'s] classroom due to safety risks. [D.D.] requires a 1:1 at all times[,] and this is documented in [D.D.'s] IEP. When I realize she won't be coming to escort [D.D.,] I ask her loudly enough so she can hear me but very politely if [Mr. Renuard] can come out because [D.D.] has started a new medication and I need to talk to him about the side effects. She disappears back inside the building[,] and after a few minutes[,] the building principal, Mr[.] Simmons[,] comes out of the door and walks up to my car. The tone of voice and body language of Mr[.] Simmons appears confrontational before I've said anything to him[,] and he is calling me by my first name instead of [my full name]. He immediately tells me I need to go to the nurse. I responded with ["]ok, I'll stop by the nurse[']s office after I drop off [D.D.,"] but that I need to talk to [D.D.'s] teacher first so I can inform him of what side effects I need him and all staff in the classroom to watch out for because [D.D.'s] already taken the first dose that morning. Mr[.] Simmons tells me that [D.D.'s] teacher is busy[,] and I ask if [D.D.] has a 1:1 para. That question is ignored[,] so I then ask who is [D.D.'s] 1:1 para. Mr[.] Simmons again ignores the question and states "well I'm here." I tell Mr[.] Simmons that I can't leave [D.D.] at school without a 1:1 para and his response is to "take [D.D.] home then[.]" I reply ["]ok.["] Simmons then tells me that I need to drop [D.D.] off out in front of the main office. I remind Mr[.] Simmons that [D.D.'s] IEP states that I can drop [D.D.] off here. Mr. Simmons immediately replies ["]no it doesn't.["] I said ["]yes it does, it says that [D.D.] has an alternative drop off and pickup location due to safety and because [D.D.] will become overwhelmed and overstimulated by the chaos and crowd.["] Mr[.] Simmons replies that it just says alternative and that I have to drop [D.D.] off out front. I explain that the front is not an alternative location, it's the actual drop off location and that location is literally the reason for needing an alternate location. Mr[.] Simmons gets visibly upset and states he's not doing this and walks back into the building. I can hear him still talking but can't make out what he's saying because his back is to me and [he] goes back into the building. I then take [D.D.] back home as instructed by Mr[.] Simmons and that's where [D.D.] has been since then. I have still not been contacted by anyone at the school nor received any paperwork regarding this unofficial suspension so this

email is my written documentation of that incident and [D.D.'s] resulting denial of FAPE that is still continuing as a result.[141]

Later that day, Mr. Simmons responded to T.R.'s email:

I received your email today and wanted to reach out and clarify that [D.D.] is not under any type of suspension from Vilonia High School. As I explained on March 29 when we visited, Vilonia High School is equipped to provide for [D.D.'s] needs as prescribed in [D.D.'s] IEP when you are ready to bring [D.D.] back to school.[142]

Mr. Simmons's email was unclear as to whether (1) D.D. would have a dedicated one-on-one

paraprofessional as D.D. did when Ms. McCord was there, or (2) instead, the school would attempt

to fulfill this requirement by some means (such as, for example, the use of several

paraprofessionals rotating throughout the day to provide one-on-one services to D.D.).[143] What is

clear is that Mr. Simmons still did not identify for T.R. one person (or multiple persons) who would

serve as D.D.'s one-on-one paraprofessional if D.D. were to return to school. So, on the evening

of April 4, T.R. sent a reply email:

I want to clarify that you most certainly did not explain to me on March 29th that VHS was equipped to provide for [D.D.'s] needs as prescribed in [D.D.'s] IEP. Actually, you did just the opposite. When you stated that [D.D.'s] teacher was not available to speak with me, I requested to speak with [D.D.'s] para. That request was ignored twice, and then you stated that you were there. Mr[.] Simmons,
1.    You are not a paraprofessional who is trained to care for special needs students.
2.    You are not familiar with [D.D.'s] medical, educational, communication, and behavioral needs.
[D.D.] not having access to a 1:1 paraprofessional is a direct violation of [D.D.'s] IEP. You may refer to [D.D.'s] IEP that was LEGALLY finalized on January 10, 2022[,] if you need this in writing. Also, [D.D.'s] IEP states that [D.D.] is to have an alternate location for [D.D.'s] pickup and drop off. You stated that I can drop [D.D.] off out front by the office. This is not considered an alternate location when other students enter and exit upon arrival and at the end of the day.

---

[141] *Id.* at 2974–75.

[142] *Id.* at 2973.

[143] *See id.* at 499–500, 510–11. Mr. Renuard's testimony at the first due process hearing suggests—but not entirely clearly—that D.D. would have a one-on-one paraprofessional even after Ms. McCord was transferred. *See id.* That does not mean this information was properly communicated to T.R., however.

[D.D.'s] teacher has never mentioned to me not being able to continue drop off and pick up at the location we have used since the beginning of the school year. March 29th was the first time I have ever been told by you[,] and you never gave a reason why I no longer can drop off and pick up at the same location. I really don't know what to call it when I am told by you to take [D.D.] back home when I expressed to you that I was not comfortable leaving [D.D.] at school without knowing that [D.D.] was going to have a paraprofessional there. I feel that any other parent could ask that same question and it would have been answered respectfully. Actually, parents have the absolute right to ask if their children's needs are being met, especially when those children are special needs and definitely when they are nonverbal and cannot speak for themselves.

IDEA states that parents have the right to give or deny their consent before the school may take certain action with respect to their child, and parents have the right to disagree with decisions made by the school on those issues. Parents have the right to disagree with any proposals to change their child's placement. When a disagreement surfaces, it is stated that the child should remain in their current program until that disagreement is resolved. The last IEP that the team (with me included) agreed upon is the IEP from January [2022]. Therefore, none of [D.D.'s] services, supports, goals, or modifications should have changed. [D.D.] should still be attending school with the same services, supports, goals, mods, etc. that are reflected in that Jan[.] 10 IEP. The proposed IEP that the team created on March 4th is not a legal binding document and was not agreed upon by the entire team (mainly me as [D.D.'s parent])[.] [D.D.] and I left the meeting before that IEP was ever developed[,] and I specified before we left that I did not agree to the FBA results and that we would have to reconvene at a later date. Ms[.] Jensen continued to meet and develop that IEP without my knowledge or consent. Mr. Simmons, you have not attended any of these meetings since the Fall semester, and this is the first email that I can recall that you have responded to regarding [D.D.] all year. I have included you in several throughout the year. It is disappointing for me as a parent that you are [D.D.'s] school administrator and yet have not reached out to me about any of these issues. Is that not your job as a school principal? The first time you discuss this with me, is when you came out to my car on March 29, not to discuss my concerns or to try to assure me that [D.D.'s] needs would be met, but instead to try to intimidate me in front of [D.D.] and tell me what was going to be done and what had to be done. You never once asked for my input. You took second[-]hand information that was told to you from other people attending the meeting and only considered their points of view[] on the situation. [D.D.] is currently being denied FAPE at Vilonia High School due to the following reasons: failure to address needs in the IEP and failure to inform/involve the parent. As [D.D.'s] parent, I am currently being denied my parental rights under IDEA and my civil rights. I do know and understand that [D.D.] needs to be in school. [D.D.] needs consistency and needs to be around [D.D.'s] peers. However, as [D.D.'s] parent, I am not comfortable with dropping off my nonverbal child at a school where no staff will communicate with me and where I am not ensured that [D.D.'s] needs (basic needs, safety needs, communicative needs, social/emotional needs, sensory needs,

educational needs, etc[.]) are being met. Doing this would be considered neglectful on my part.[144]

On April 8, 2022, the District unenrolled D.D. from Vilonia High School.[145] They say they did so because D.D. was absent from school for ten consecutive days.[146] But that is, at best, hard to understand. T.R. had explained that D.D. was absent from school for medical reasons through March 18 and also on March 28.[147] (March 21–March 25 was spring break.[148]) And the IEP explains that, "[i]n relation to attendance[,] if [D.D.] stays at home due to sickness[,] [T.R.] will notify the teacher and [D.D.'s] absences will be excused."[149] So, if one counts the (arguably) unexcused absences from March 29 on, D.D. had only nine absences as of April 8, 2022.[150]

Even though D.D. was unenrolled from school (and did not attend school for the rest of the 9th-grade school year or during the following summer[151]), it appears that T.R. and the District attempted to set up IEP meetings to resolve outstanding disputes. But each attempt was stymied.[152] The first prospective meeting (on April 18, 2022) never started because Ms. McCord was not in attendance.[153] T.R. wanted her there.[154] But, it turns out, the District would not let Ms. McCord

---

[144] *Id.* at 2972–73.

[145] *See id.* at 1868–69 (no longer tracking D.D.'s absences after April 8, 2022).

[146] *See* Br. in Supp. of Def.'s Mot. for J. on the R. (Doc. 16) at 24; *see also* Ark. Code Ann. § 6-18-213(f)(1) ("Except for those circumstances otherwise allowed by rule, any student who is absent from daily attendance for more than ten (10) consecutive school days shall be dismissed or dropped from the attendance records of the school, school district, or open-enrollment public charter school.").

[147] Administrative R. (Doc. 14) at 1276–80.

[148] *Id.* at 1278.

[149] *Id.* at 2259.

[150] *See id.* at 1868–69.

[151] *Id.* at 1315. Essentially, up until the time the Due Process Complaints were filed, no services were provided to D.D. by Vilonia School District after D.D. was unenrolled from the District. *Id.* at 247–48, 986.

[152] *See id.* at 1096, 1293–95, 1301–12.

[153] *Id.* at 1293–95.

[154] *See id.* at 1295.

(who had been reassigned to another school) attend the meeting without using one of her personal days.[155] And Ms. McCord did not want to do that. So, T.R. requested that the meeting be rescheduled so that Ms. McCord could attend.[156]

There was a meeting scheduled for April 25, 2022.[157] But the special education director—obviously an important member of the IEP team—realized she had a conflict (with another IEP meeting for another student).[158] So, the meeting was rescheduled to May 27, 2022.[159] On May 27, 2022, T.R. showed up for the meeting and asked for a bunch of information that T.R. felt was necessary to have a useful IEP-related discussion.[160] The IEP team did not have that data at the ready, so the meeting was once again put off—for an unspecified amount of time.[161] This IEP meeting was never rescheduled.[162] Instead, in July and then again in August of 2022, District staff (most particularly the special education director) told T.R. that they could not have further IEP meetings until T.R. re-enrolled D.D. in the Vilonia School District.[163]

**D.    T.R.'s First Due Process Complaint and D.D.'s Move to Compass Academy**

By this time, T.R. had had enough. On August 12, 2022, T.R. filed T.R.'s First Due Process Complaint.[164] On September 6, 2022, the District and T.R. held a "Resolution Session," discussing

---

[155] *Id.* at 905, 908, 961–62, 1293–95.

[156] *Id.* at 1295.

[157] *Id.* at 1305.

[158] *Id.* at 1305–06.

[159] *Id.*

[160] *Id.* at 1308–09.

[161] *Id.*

[162] *Id.* at 1309.

[163] *Id.* at 1309, 2983, 3002–10.

[164] *Id.* at 1–18.

the possibility of a settlement of the First Due Process Complaint.[165]  As part of the prospective settlement, D.D. would no longer attend school at Vilonia School District and would instead attend school at Compass Academy.[166]  Compass Academy is a private institution that specializes in the education of students with disabilities.[167]  Before the Resolution Session, the District's special education director, Ms. Jensen, visited Compass Academy and determined that it was appropriate for D.D.[168]

At the Resolution Session, T.R.'s attorney told T.R. that it was the attorney's understanding that the District agreed that D.D. "could go ahead and start" at Compass Academy.[169]  Although it was clear that the meeting did not resolve whether D.D. would need a one-on-one paraprofessional at Compass Academy or who would pay for the paraprofessional if one was necessary, T.R.'s counsel explained that, as for attending Compass Academy, "it looks like it's a go."[170]  The District's attorney's response indicated agreement with this proposition.  After saying, "yeah, so, awesome," he asked whether T.R. agreed to that plan.[171]  There is no way to understand this except that the District was agreeing to have D.D. attend Compass Academy at the expense of the District.[172]

---

[165] *See* Sept. 6, 2022 Recording (available at page 3082 of the Administrative Record); *see also* 20 U.S.C. § 1415(f)(1)(B).

[166] Administrative R. (Doc. 14) at 984.

[167] *Id.* at 363.

[168] *Id.* at 985–86; Sept. 6, 2022 Recording at 0:02:27–59.

[169] Sept. 6, 2022 Recording at 0:02:37–52.

[170] *Id.* at 0:02:53–57.

[171] *Id.* at 0:02:57–0:03:03.

[172] *See* Administrative R. (Doc. 14) at 984 ("You asked us for tuition to Compass, and we agreed to that." (Jensen testifying)).

22

To be clear, this was not a full settlement of T.R.'s First Due Process Complaint.[173]  T.R. was concerned that the District was not going to pay for a one-on-one paraprofessional.[174]  T.R.'s attorney explained that the plan was to have D.D. start to attend Compass Academy to determine whether D.D. would need a one-on-one paraprofessional.[175]  But the settlement agreement was not going to be signed until it was determined whether D.D. would need a one-on-one paraprofessional.[176]  The District's attorney never objected to this plan.  The conversation then moved on to how D.D. would be transported to Compass Academy.[177]  T.R. wanted to do the transporting and to be reimbursed for it by the District.[178]  The District instead wanted to be the ones to transport D.D.[179]  These loose ends stood in the way of a final settlement at that time.[180]

D.D. began attending Compass Academy on October 6, 2022.[181]  It was quickly determined that D.D. would need a one-on-one paraprofessional.[182]  Because the District did not want to pay for the services of a one-on-one paraprofessional, settlement discussions eventually broke down and a settlement agreement was never reached.[183]  As a result, the District did not pay for D.D.'s tuition at Compass Academy or D.D.'s paraprofessional.[184]  After settlement negotiations broke

---

[173] *See* Sept. 6, 2022 Recording at 0:09:54–0:10:40.

[174] *Id.* at 0:03:08–12.

[175] *Id.* at 0:03:15–52.

[176] *Id.*

[177] *Id.* at 0:03:56–0:07:50.

[178] *Id.* at 0:03:57–0:04:01.

[179] *Id.* at 0:04:01–06.

[180] *See id.* at 0:10:11–40.

[181] *See* Administrative R. (Doc. 14) at 383–84, 2787.

[182] *Id.* at 367–68.

[183] *See id.* at 1330–31, 2792–93, 3016–19.

[184] *Id.* at 2632–33, 2793.

down, the District did not develop a new IEP so that D.D. could go back to Vilonia High School.[185] Instead, it appears that the District was content to let D.D. attend Compass Academy. To this day, no new IEP for D.D. has been developed.[186]

D.D. spent the entirety of the 2022–2023 school year (D.D.'s 10th-grade year) at Compass Academy.[187] (And D.D. continues to attend Compass Academy.[188]) D.D.'s class at Compass Academy for the 2022–2023 school year had nine total students.[189] D.D. received 60 minutes of speech therapy and 60 minutes of physical therapy per week.[190] During the 2022–2023 school year, D.D. made progress in being able to participate in the classroom setting, using a communication device, handwriting, independence, and making friends.[191] Ms. McCord (who has made a reappearance as D.D.'s one-on-one paraprofessional at Compass Academy) testified at the first administrative hearing that D.D. "has done amazing" at Compass Academy.[192] The teachers provide D.D. with accommodative work.[193] And, since enrolling at Compass Academy, D.D. has only had one meltdown—which was brought on by an illness.[194] All indications point to D.D. thriving at Compass Academy.[195]

---

[185] *Id.* at 977.

[186] *See id.* at 1332.

[187] *Id.* at 2606.

[188] *Id.* at 366.

[189] *Id.* at 871.

[190] *Id.* at 366.

[191] *Id.* at 373–78, 2613–16.

[192] *Id.* at 871.

[193] *Id.* at 872.

[194] *Id.* at 830.

[195] *Id.* at 1324, 2797–2807.

Back to the First Due Process Complaint. T.R.'s August 12, 2022 Due Process Complaint asked the Hearing Officer to find that: (1) the District failed to provide D.D. with a FAPE during the 2020–2021 (8th grade), 2021–2022 (9th grade), and 2022–2023 (10th grade) school years due to both procedural and substantive violations; (2) the District would not be able to provide D.D. a FAPE in the 2022–2023 school year; and (3) Compass Academy is an appropriate placement for D.D.[196]  The Hearing Officer issued an Administrative Decision on June 25, 2023.[197]

The decision was a split one.  The Hearing Officer noted that T.R. conceded (at the due process hearing) that D.D. had been provided a FAPE during the 2020–2021 school year.[198]  The Hearing Officer also found, independent of this concession, that the District provided a FAPE during the 2020–2021 school year.[199]  But things were different when it came to the 2021–2022 and 2022–2023 school years.  As to those years, the Hearing Officer found that the District did not provide D.D. with a FAPE.[200]

The Hearing Officer first found that the District procedurally violated the IDEA.[201]  The Hearing Officer explained that the District "summarily dismissed [D.D.] from special education when [it] unilaterally unenrolled [D.D.] for nonattendance, failed to develop an IEP for [D.D.] for the 2022–2023 school year[,] and failed to meet its obligation under [the IDEA's Child Find provisions] after unilaterally unenrolling [D.D.] . . . ."[202]  The Hearing Officer found each of these

---

[196] *Id.* at 13–14.

[197] *Id.* at 121–55.

[198] *Id.* at 144–45, 1340–41.

[199] *Id.* at 144–45.

[200] *Id.* at 145–49.

[201] *Id.* at 138–42.

[202] *Id.* at 141.  The Hearing Officer noted that "[t]he District dismissed [D.D.] from special education when [it] summarily unenrolled [D.D.] from the District knowing that [T.R.] was attempting to schedule a facilitated IEP meeting, that [T.R.] had a disagreement over the paraprofessional, and that [D.D.] was not required to follow the District attendance policy per [D.D.'s] IEP." *Id.* at 147.  The Hearing Officer also noted that "[o]nce the District unenrolled [D.D., it] still had an obligation to provide [D.D.] a FAPE.  The evidence shows that the District was aware

25

actions amounted to procedural violations of the IDEA and went on to "consider whether these procedural violation[s] resulted in a substantive denial of FAPE to [D.D.]."[203] The Hearing Officer answered that question in the affirmative, explaining that each violation "caused a deprivation of educational benefit" because D.D. "did not receive any educational benefit when the District failed to provide [D.D.] any services after unenrolling [D.D.] on April 8, 2022."[204] The Hearing Officer further explained:

> This both prevented [D.D.] from receiving any educational benefit but also seriously hampered Parent's opportunity to participate.  [D.D.] cannot receive educational benefit, nor can Parent have any opportunity to participate, when the [D]istrict failed/refused to develop an IEP for [D.D.] for the 2022–23 school year. Lastly, once [D.D.] was unenrolled[,] District had a child find obligation that they failed to act on, whereby seriously hampering the Parent's opportunity to participate and causing deprivation of educational benefit to [D.D.].[205]

The Hearing Officer also concluded that the District substantively violated the IDEA (apart from any procedural violations) when it failed to properly implement D.D.'s 2021–2022 IEPs and failed to create any IEP for the 2022–2023 academic year.[206] With respect to the 2021–2022 school year, the Hearing Officer explained, *inter alia*, that:

(1) "[t]estimony from both Mr. [Renuard], [D.D.'s] classroom teacher[,] and [Ms.] McCord, [D.D.'s] paraprofessional[,] describe a classroom that lacked structure and appropriate instruction";[207]

(2) "[t]he evidence showed that [D.D.] was not receiving direct instruction in English Exploration, Math Exploration, Science Exploration, History Exploration[,] or Transition 1 from the start of [the] 2021–2022 school year to December 8, 2021[,] when the IEP was amended[,] or in Functional Academics, Domestic Skills, Community

---

that [D.D.] was still in the District and the District[,] by the testimony of Mr. Simmons, Mr. Adams, and [Ms.] Jensen[,] understood it had a continued obligation to [D.D.,] but failed to act on that obligation." *Id.* at 148.

[203] *Id.* at 141.

[204] *Id.* at 142.

[205] *Id.*

[206] *Id.* at 138–42, 145–47.

[207] *Id.* at 146.

Skills, Vocational Skills[,] and Recreation and Leisure as prescribed from December 8, 2021[,] through the end of [D.D.'s] 2021–2022 school year";[208]

(3) "there was inadequate training on [D.D.'s] Proloquo2Go";[209] and

(4) accordingly, "[t]he District failed to properly implement [D.D.]'s 2021–2022 IEP by failing to provide direct instruction in the self-contained classroom as prescribed in [D.D.'s] IEP."[210]

With respect to the 2022–2023 school year, the Hearing Officer explained that the District denied D.D. a FAPE because the District failed to develop an IEP for the school year and failed to offer D.D. any special education services.[211]  The Hearing Officer said that the District had a duty to develop an IEP and offer services because (1) it was responsible for unilaterally unenrolling D.D. from public school, and (2) it knew D.D. still resided in the geographic zone of the District.[212]

The Hearing Officer then addressed whether the District would be able to provide D.D. a FAPE prospectively.[213]  She did so because, "[i]n addition to a denial of FAPE, a claim for private school tuition as compensatory education must include proof that the school district cannot prospectively provide a FAPE" and also that "the private school is an appropriate placement."[214] The Hearing Officer held that T.R. did not present sufficient evidence to suggest that the District would not be able to provide D.D. a FAPE in the future.[215]  According to the Hearing Officer, the fact that the District was able to provide a FAPE in the 2020–2021 school year "shows that the

---

[208] *Id.*

[209] *Id.* at 146–47.

[210] *Id.* at 147.

[211] *Id.* at 138–42, 147–49.

[212] *See id.* at 147–49.

[213] *See id.* at 150–51.

[214] *Id.* (quotation marks and citation omitted).

[215] *Id.* at 151.

District is capable of prospectively providing [D.D.] a FAPE."[216]  Because she found that the District could provide D.D. a FAPE in the future, the Hearing Officer did not address whether Compass Academy was an appropriate placement for D.D.

The Hearing Officer did, however, briefly address T.R.'s argument that the District had—at the Resolution Session—agreed to place D.D. at Compass Academy and pay for D.D. to attend that school.[217]  This is an important argument because, if the Hearing Officer had concluded that the District agreed to change D.D.'s placement, then the District likely would have been obligated to pay for the cost of sending D.D. to Compass Academy until there was a new (and lawful) IEP that contemplated the return of D.D. to the District.[218]  In this scenario, because the District never came up with an IEP to return D.D. from Compass Academy to the Vilonia School District, T.R. could have successfully received payment for Compass Academy (potentially including transportation to, and a one-on-one paraprofessional at, Compass Academy) without having to prove anything concerning the denial of a FAPE, the prospective inability of receiving a FAPE at the Vilonia School District, and Compass Academy's appropriateness as a placement.

Unfortunately for T.R. and D.D., the Hearing Officer concluded that she could not consider whether the District agreed to D.D.'s placement at Compass Academy because (1) the agreement was alleged to have occurred in September of 2022, and (2) that was *after* the First Due Process Complaint was filed on August 12, 2022.[219]  The Hearing Officer thus believed that the "entire argument regarding the District's agreement to place and pay for [D.D.] to attend Compass

---

[216] *Id.*

[217] *See id.* at 149–50.

[218] *See* 20 U.S.C. § 1412(a)(10)(B)(i) (stating that, when a child is placed in a private school by a school district, special education services at the private school are provided "at no cost to [the child's] parents"); *see also* 20 U.S.C. § 1415(b)(3) (requiring written notice compliant with 20 U.S.C. § 1415(c)(1) before changing a student's educational placement).

[219] Administrative R. (Doc. 14) at 149–50.

Academy [was] outside the scope of this hearing . . . ."[220]   The Hearing Officer noted that, "if [T.R.] wanted [the agreement] issue decided[, T.R.] should have amended [T.R.'s] due process complaint or filed a new due process complaint."[221]   Bottom line: the Hearing Officer decided that she "[would] not make a ruling on [the agreement] issue at [that] time."[222]

As far as relief was concerned, the Hearing Officer ordered the District to perform a series of evaluations of D.D., to hold an IEP meeting, to develop an IEP for D.D., to meet every thirty days during the implementation of the IEP to discuss D.D.'s progress and make any necessary changes, to train all staff serving D.D. on D.D.'s communication device, and to provide 28,000 minutes of compensatory Applied Behavior Analysis therapy to make up for the services that D.D. had been denied.[223]

### E.    The Second Due Process Complaint

On July 13, 2023—about three weeks after the first Due Process claim was decided—T.R. filed a Second Due Process Complaint.[224]   The Second Due Process Complaint asked the Hearing Officer to find that (1) the District failed to provide D.D. a FAPE before D.D. was enrolled in Compass Academy, and (2) Compass Academy was an appropriate placement for D.D.[225]   The Complaint sought three types of relief from the District: (1) payment for the tuition and costs associated with D.D.'s enrollment at Compass Academy for the 2022–2023 school year; (2) payment for the tuition and costs associated with D.D.'s enrollment at Compass Academy for the 2023–2024 school year; and (3) payment for the tuition and costs associated with D.D.'s

---

[220] *Id.* at 150.

[221] *Id.*

[222] *Id.*

[223] *Id.* at 152–54.

[224] *Id.* at 2452–64.

[225] *Id.* at 2461–62.

29

enrollment at Compass Academy until the District offers D.D. an IEP that will provide D.D. with a FAPE in the District (or at least at some place other than Compass Academy).[226]

The Hearing Officer issued her Second Administrative Decision on October 5, 2023.[227] For the same reasons as set forth in the First Administrative Decision, the Hearing Officer explained that the District procedurally violated the IDEA for the 2022–2023 school year because it failed to develop an IEP for D.D. for that year.[228] And the Hearing Officer again explained that, substantively, the District thereby denied D.D. a FAPE for the 2022–2023 school year.[229] On these points, the only real difference between the First and Second Administrative Decisions was that the Second Administrative Decision's conclusions covered the time period between the filing of the First and Second Due Process Complaints, including the time period after D.D. began attending Compass Academy.[230]

The Hearing Officer explained that, even after D.D. began attending Compass Academy in October of 2022, the District still had (and failed to carry out) an obligation to develop and monitor the implementation of an IEP.[231] In large part, that was because the Hearing Officer concluded that (1) the District had unilaterally unenrolled D.D. from the District in April of 2022,[232] and (2) the placement of D.D. at Compass Academy was agreed to by the District prior to D.D.'s enrollment at that school.[233] That is, the Hearing Officer concluded that this was not a situation

---

[226] *Id.* at 2462–63.

[227] *Id.* at 2551–77.

[228] *Id.* at 2567–72.

[229] *Id.* at 2572.

[230] *See id.* at 2562–63.

[231] *Id.* at 2569–71.

[232] *See id.* at 2569–70.

[233] *See id.* at 2570–72.

where the parent refused an IEP, unilaterally took the child out of a public school, or unilaterally placed the child in a private school setting.[234]

Having found that the District's violations denied D.D. a FAPE in 2022–2023, the Hearing Officer next addressed whether the District should have to pay the Compass Academy tuition (plus certain other expenses) for the 2022–2023 school year and whether the District should have to pay the Compass Academy tuition (plus certain other expenses) for the 2023–2024 school year.[235]  The first question is aptly characterized as a reimbursement question—because the 2022–2023 school year was over when the Second Due Process Complaint was filed.[236]  The second question is aptly characterized as one of prospective relief—because the 2023–2024 school year had not yet begun when the Second Due Process Complaint was filed.[237]  To understand the Second Administrative Decision's conclusions with respect to these two questions, it is worth spending a few moments on the proper standards for reimbursement and for prospective relief.

An order for reimbursement for a private school placement can be justified in one of two ways.  First, a plaintiff can show that the placement was agreed to by the school district before the student's enrollment at the private school and that the school district never subsequently developed a lawful IEP moving the student somewhere else.[238]  Second, if the placement was not agreed to

---

[234] *See id.* at 2570.

[235] *See id.* at 2572–75.

[236] *See id.* at 2464, 2894.

[237] *See id.*

[238] *See* 20 U.S.C. § 1412(a)(10)(B) ("Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an [IEP], at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency . . . ."); 34 C.F.R. § 300.146 ("Each [state educational agency] must ensure that a child with a disability who is placed in or referred to a private school or facility by a public agency is provided special education and related services [i]n conformance with an IEP . . . and at no cost to the parents . . . ."); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 251 (2009) ("[Congress] said that whenever the State or a local educational agency refers a student to private special education, the bill is a public expense." (Souter, J., dissenting)); *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 221 (3d Cir. 2017) ("This reimbursement obligation exists . . . when the school district and the parents agree that the child should be in private school . . . .").

31

by the school district, a plaintiff must show the school district's denial of a FAPE and the appropriateness of the private school as an alternative placement.[239]

The standards for prospective relief are a little different. First, if a plaintiff shows that the placement was agreed to by the school district before the student's enrollment at the private school and that the school district has not developed a lawful IEP moving the student somewhere else, a hearing officer or court can order a school district to pay for a private school placement until the school district develops a lawful IEP (or otherwise provides parents with a proper written notice) that moves the student somewhere else.[240] Second, if the placement was not agreed to by the school district, a plaintiff must show the school district's denial of a FAPE, the appropriateness of the private school as an alternative placement, and the prospective inability of the school district to provide a FAPE for the student.[241]

It is unclear if the Hearing Officer fully appreciated all of the standards at play.[242] The Hearing Officer appears to have operated under the view that, to order the District to pay for Compass Academy for 2022–2023 and 2023–2024, she needed to conclude that the District did not provide a FAPE for D.D., that Compass Academy was an appropriate alternative placement,

---

[239] *See Sneitzer*, 796 F.3d at 948.

[240] *See* 20 U.S.C. § 1415(b)(3) (requiring written notice compliant with 20 U.S.C. § 1415(c)(1) before changing a student's educational placement); 20 U.S.C. § 1415(i)(2)(C)(iii) (providing that the court "shall grant such relief as the court determines is appropriate").

[241] *See Brantley ex rel. Brantley v. Indep. Sch. Dist. No. 625*, 936 F. Supp. 649, 655 (D. Minn. 1996) ("[C]ompensatory education in the form of placement in a private school at public expense is appropriate relief where it is demonstrated that FAPE is not possible in public schools."); *see also Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985) ("The Act contemplates that such education will be provided where possible in regular public schools, . . . but the Act also provides for placement in private schools at public expense where this is not possible. In a case where a court determines that a private placement desired by the parents was proper under the [IDEA] and that an IEP calling for placement in a public school was inappropriate, it seems clear beyond cavil that 'appropriate' relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school." (internal citations omitted)).

[242] *See* Administrative R. (Doc. 14) at 2572–75.

and that (at least for the 2023–2024 school year) the District was prospectively unable to provide a FAPE for D.D.[243]

This Court has already explained the Hearing Officer's analysis concluding that the District did not provide D.D. a FAPE for 2022–2023 (and by implication did not provide a FAPE for 2023–2024).[244] The Hearing Officer concluded that Compass Academy was an appropriate alternative placement, in large part because "[t]he District was a willing participant in the decision that Compass Academy was an appropriate placement and that [D.D.] should attend Compass Academy beginning October 6, 2022."[245] The Hearing Officer more than once stressed (in varying words) that "[T.R.] and the District agreed that Compass Academy was an appropriate placement for [D.D.]."[246] But the Hearing Officer also relied on testimony concerning what Compass Academy is; what Compass Academy does; how Compass Academy structures its classes, studies, and provision of therapy; and D.D.'s progress at Compass Academy.[247]

That left the question of whether the District could prospectively provide D.D. with a FAPE. The Hearing Officer concluded—in a fairly terse paragraph—that the District could not do so:

> Applying the law to the facts in this case, [T.R.] has presented sufficient evidence that the District is unwilling and therefore unable to prospectively provide [D.D.] a FAPE. Based on the evidence presented in this case, the District's unwillingness to even meet its basic obligations, of holding an IEP meeting and developing an appropriate program for [D.D.] for the 2022–2023 school year under IDEA, proves that the District is incapable or unwilling to prospectively provide [D.D.] a FAPE.[248]

---

[243] *See id.*

[244] *See supra* page 27.

[245] Administrative R. (Doc. 14) at 2572.

[246] *Id.* at 2574.

[247] *See id.* at 2575.

[248] *Id.* at 2574.

At first glance, this conclusion might appear to be in considerable tension with the First Administrative Decision.[249] Recall that the First Administrative Decision (issued in June of 2023) concluded that T.R. failed to present sufficient evidence to suggest that the District would not be able to prospectively provide D.D. a FAPE—relying on the fact that the District was able to provide a FAPE in the 2020–2021 school year.[250]

The Hearing Officer did offer (indirectly) something of an explanation for the seeming inconsistency between the two Decisions.[251] Although many of the relevant "facts" underlying the two Decisions overlap, the Second Administrative Decision takes account of extra facts compared to the First Administrative Decision.[252] These additional facts concern the District's failure to develop and monitor an IEP from August 19, 2022 (the filing of the First Due Process Complaint) through July 13, 2023 (the filing of the Second Due Process Complaint).[253] Indeed, the Hearing Officer notes that "the claims raised by [T.R.] in [T.R.'s] August 12, 2022[] due process complaint dealt with . . . [D.D.'s] eighth and ninth grade years," whereas the Second Due Process Complaint "addresses . . . .[D.D.]'s tenth grade year."[254]

Ultimately, the Hearing Officer ordered the District "to pay tuition and all costs for Compass Academy, including the cost of the one-on-one paraprofessional for the 2022–2023 school year . . . ."[255] The Hearing Officer further ordered the District to prospectively "pay tuition and all costs for Compass Academy, including the cost of the one-on-one paraprofessional for the

---

[249] *Compare id.* at 151, *with id.* at 2574.

[250] *Id.* at 151.

[251] *See id.* at 2574–75.

[252] *Compare id.* at 125–33, *with id.* at 2554–63.

[253] *See id.* at 2562–63.

[254] *Id.* at 2575.

[255] *Id.* at 2576.

2023–2024 school year . . . ."[256]  Finally, the Hearing Officer ordered the District to "reimburse [T.R.] for mileage to take [D.D.] to and from Compass Academy for the 2022–2023 school year and the 2023–2024 school year."[257]

## F.    The Instant Litigation

On December 15, 2023, T.R. filed a Complaint seeking attorneys' fees and costs associated with litigating the Due Process Complaints.[258]  On January 4, 2024, the District filed an Answer and Counterclaim.[259]  The Counterclaim sought review of each of the Hearing Officer's conclusions from the two Administrative Decisions that went against the District.[260]  Specifically, the District challenged the following findings and conclusions: (1) that the District failed to provide D.D. a FAPE for the 2021–2022 and 2022–2023 school years; (2) that Compass Academy was an appropriate placement for D.D.; and (3) that the District was unwilling and therefore unable to prospectively provide D.D. with a FAPE.[261]  In the summer of 2024, the parties filed their cross-Motions for Judgment on the Record.[262]  The Court held oral argument on September 12, 2024.[263]  Supplemental briefing was completed on September 26, 2024.[264]  The case is now ripe for decision.

---

[256] *Id.*

[257] *Id.*

[258] Compl. (Doc. 1).

[259] Answer (Doc. 6).

[260] *Id.* ¶¶ 29–38.

[261] *Id.* ¶¶ 33, 36.

[262] Def.'s Mot. for J. on the R. (Doc. 15); Pl.'s Mot. for J. on the R. (Doc. 17).

[263] Sept. 12, 2024 Clerk's Minutes (Doc. 22).

[264] Pl.'s Br. Regarding Jurisdiction (Doc. 23); Def.'s Br. Regarding Jurisdiction (Doc. 24).

### G.    Legal Conclusions

Although the factual and procedural history in this case is winding and complex, the Court believes the legal outcome to be fairly straightforward.  That outcome largely turns on one major factual dispute between the parties: Was D.D.'s placement at Compass Academy done with the agreement of the District or was it a unilateral decision by T.R.?  On this question, the Court agrees—as a *de novo* matter—with the Hearing Officer.  Based on all the relevant record evidence, T.R. has proved by a preponderance of the evidence that, on September 6, 2022, the District agreed to place D.D. in Compass Academy.  T.R. has also proved that D.D. did not begin attending Compass Academy until a month after this agreement.[265]

The Court acknowledges the District's argument to the contrary.  The District correctly explains that this so-called agreement took place in the context of the Resolution Session required under 20 U.S.C. § 1415(f)(1)(B).[266]  The District then correctly asserts that the Resolution Session did not culminate in a formal agreement between the parties.[267]  But the District omits, or downplays, some important things that occurred in that meeting.  The 12-minute recording of that meeting—which no one suggests is incomplete or otherwise misleading—makes plain (in the Court's view) that the District was agreeing to the immediate placement of D.D. at Compass Academy despite outstanding questions concerning transportation and the use of a one-on-one paraprofessional.[268]

The agreement to place D.D. at Compass Academy has significant implications for the rest of this case.  Most importantly, it renders unnecessary a decision as to whether the District had

---

[265] *See* Administrative R. (Doc. 14) at 383–84, 2787.

[266] *See* Reply in Supp. of Def.'s Mot. for J. on the R. (Doc. 20) at 8.

[267] *See id.*

[268] *See generally* Sept. 6, 2022 Recording.

provided D.D. (or prospectively could have provided D.D.) with a FAPE during the 2022–2023 and 2023–2024 school years.[269]  So long as (1) the District agreed to the placement of D.D. at Compass Academy prior to D.D. starting there in the fall of 2022, and (2) the District never subsequently developed an IEP to move D.D. back to the District (or to somewhere other than Compass Academy), the District had an obligation to pay for Compass Academy regardless of whether it had provided (or could prospectively provide) D.D. a FAPE back in the District.[270]  The 2022–2023 and 2023–2024 school years are now complete.[271]  And there is no evidence to suggest that the District ever developed an IEP to move D.D. back to the District (or to somewhere other than Compass Academy).  Accordingly, the District is required to pay for Compass Academy for the 2022–2023 and 2023–2024 school years.[272]

---

[269] With respect to the District's ability to prospectively provide a FAPE, the Court reads the Second Administrative Decision as concluding that the District could not (or would not) do so for the 2022–2023 and 2023–2024 school years only.  *See* Administrative R. (Doc. 14) at 2574–76.  The Court does not read the Second Administrative Decision as a blanket conclusion that the District could not (or would not) provide D.D. a FAPE in subsequent years (2024–2025, 2025–2026, etc.).  To the extent the Second Administrative Decision could be read as such a blanket conclusion (i.e., as applying beyond the 2023–2024 school year), the Court vacates that conclusion as unnecessary to the Administrative Decision's ultimate disposition.

On a separate front, to the extent the agreed placement does not absolve the Court from having to determine whether Compass Academy is an appropriate placement, the Court concludes—as a *de novo* matter—that Compass Academy is an appropriate placement for the same reason as the Hearing Officer so concluded.  *See id.* at 2575.

[270] *See supra* note 238.

[271] *See* Sept. 12, 2024 Hr'g Tr. (rough) at 11:02:35–11:03:29.

[272] In the First Administrative Decision, the Hearing Officer specifically refused to rule on—and considered as outside the scope of the underlying Complaint—the question whether the District had agreed to D.D.'s placement at Compass Academy before D.D. started there.  *See* Administrative R. (Doc. 14) at 149–50.  In light of this ruling, the Court does not believe that either *res judicata* principles or issue preclusion principles prevent this Court from now reviewing the agreement-theory evidence and resolving the agreement-theory arguments.  *See Banks v. Int'l Union Elec., Elec., Tech., Salaried and Mach. Workers*, 390 F.3d 1049, 1052 (8th Cir. 2004) ("[A] claim is barred by res judicata if it arises out of the same nucleus of operative facts as the prior claim." (quotation marks and citation omitted)); *id.* at 1054 ("Collateral estoppel bars the relitigation of factual or legal issues that were determined in a prior . . . action . . . ." (quotation marks and citation omitted)).  Indeed, the District's *res judicata*/issue preclusion argument was mostly about the Hearing Officer's conclusion that the District could not prospectively provide a FAPE for D.D.  *See* Br. in Supp. of Def.'s Mot. for J. on the R. (Doc. 16) at 13–16; Reply in Supp. of Def.'s Mot. for J. on the R. (Doc. 20) at 5–7.  As the Court explains in today's Order, the Court's resolution of the agreement-theory issue means that it need not resolve the prospective FAPE issue.

Of course, this does not answer the question whether, in these circumstances, the District is required by the IDEA to pay for the one-on-one paraprofessional used at Compass Academy and to reimburse T.R. for T.R.'s transportation costs associated with D.D. attending Compass Academy. But those questions can be answered in fairly short order. Let's start with the paraprofessional. At all times relevant to this record, D.D.'s IEPs required that D.D. have access to a one-on-one paraprofessional.[273] Given this, especially when combined with the record evidence concerning the severity and symptoms of D.D.'s autism, the Court has little trouble concluding that a one-on-one paraprofessional was necessary to the provision of a FAPE to D.D.[274] The evidence does not suggest that the presence of a one-on-one paraprofessional was any less necessary for D.D. at Compass Academy than it was at Vilonia Middle School or Vilonia High School.[275] And since D.D.'s placement at Compass Academy was done by agreement, the District had a continuing obligation to pay for all necessary services—including a paraprofessional.[276]

Again, the Court acknowledges the District's arguments to the contrary. Most notably, the District contends that, because T.R. unilaterally unenrolled D.D. from the District in April of 2022 (by keeping D.D. home instead of sending D.D. to school) and unilaterally enrolled D.D. at Compass Academy, the District was no longer under an obligation to provide services.[277] The

---

[273] Administrative R. (Doc. 14) at 1592, 2114, 2134, 2268, 2327, 2349.

[274] *See id.* at 367–69; 788.

[275] *See id.* at 367–79.

[276] *See* 34 U.S.C. § 300.146 ("Each [state education agency] must ensure that a child with a disability who is placed in or referred to a private school or facility by a public agency is provided special education and related services [i]n conformance with an IEP that meets the requirements of §§ 300.320 through 300.325; and [a]t no cost to the parents . . . ."); *Jackson v. Pine Bluff Sch. Dist.*, No. 4:16cv00301-JM-JTR, 2017 WL 2296896, at *4 (E.D. Ark. May 12, 2017) ("Although the IDEA *expressly permits* public educational agencies to place a disabled child in a private school or facility, as a means of providing the child with the special education and related services required by law and by the child's IEP, *responsibility for compliance with the IDEA remains with the public agencies*—not the private educational facility.").

[277] *See* Br. in Supp. of Def.'s Mot. for J. on the R. (Doc. 16) at 24–25; Reply in Supp. of Def.'s Mot. for J. on the R. (Doc. 20) at 10–11.

problem for the District is that, on a *de novo* review of the record, the Court agrees with the Hearing Officer that (1) the District was not relieved of its obligation to provide D.D. with a FAPE when it (improperly) unenrolled D.D.,[278] and (2) the District agreed to D.D.'s enrollment at Compass Academy before D.D. started there.[279] So, the District's obligations to develop and monitor an IEP, and ultimately to provide D.D. a FAPE, never stopped. After all, a school district cannot avoid its IDEA obligations by unilaterally (and improperly) unenrolling students the school district doesn't want to serve.[280] Long story short, the District was on the hook for a one-on-one paraprofessional unless and until a lawful IEP removed that service.

The Court comes to a different conclusion with respect to transportation costs. When the District agreed to the placement of D.D. at Compass Academy, the District offered to transport D.D. to and from Compass Academy.[281] T.R. rejected this offer and instead demanded reimbursement for privately transporting D.D. to Compass Academy.[282] It appears that T.R. was concerned that D.D. would be on the bus for a long time and that the other students on the bus would have behavioral problems that would place D.D. in danger given D.D.'s autism.[283] The District noted that the bus ride would be approximately 30 minutes and that there would be a bus

---

[278] *See* Administrative R. (Doc. 14) at 138–39 (explaining why it was the District—and not T.R.—who unilaterally unenrolled D.D.); *see also id.* at 929 ("As you pointed out, the obligation [to provide a FAPE] is not extinguished [by unenrollment]. If the child is still a resident of the school district, we have an obligation under the IEP." (Adams testifying)); *id.* at 968 (Q: "Do you agree that you are obligated, no matter whether [D.D.] was enrolled or unenrolled, to provide [IEP] services?" A: "If we knew [D.D.] was a resident here and [D.D.] was a resident here, yes." (Jensen testifying)); 20 U.S.C. § 1412(a)(1)(A) (requiring that "[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school").

[279] *See* Administrative R. (Doc. 14) at 2570–71; Sept. 6, 2022 Recording.

[280] *See* 20 U.S.C. § 1412(a)(1)(A); *see also supra* page 20.

[281] *See* Sept. 6, 2022 Recording at 0:04:01–06.

[282] *Id.* at 0:04:06–10.

[283] *Id.* at 0:04:20–0:06:10.

driver and aide on the bus.[284] All in all, T.R. has not proved by a preponderance of the evidence that the District's offer to transport D.D. was unreasonable. T.R. cannot unilaterally reject this reasonable provision of transportation services and then demand reimbursement for transportation costs that T.R. would not have incurred if T.R. had accepted the services.[285] The Hearing Officer should not have required the District to reimburse T.R. for transportation costs for the 2022–2023 school year or the 2023–2024 school year.[286]

In light of the Court's analysis thus far, there is really only one other potential portion of the two Administrative Decisions left to address: the Hearing Officer's conclusion that the District procedurally and substantively violated the IDEA with respect to D.D.'s 2021–2022 academic year. To the extent the Hearing Officer's conclusion was based on the District's alleged failures to implement the developed IEP, the issue is moot and does not fall within the capable-of-repetition-yet-evading-review exception to mootness.[287] To the extent the Hearing Officer's conclusion was

---

[284] *Id.* at 0:06:10–0:07:08.

[285] Parents of children in private school who are covered by the IDEA are entitled to have their child transported to the private school at no cost. *See* 20 U.S.C. § 1401(26)(A). But as a "related service," the district need only provide transportation services sufficient "to assist a child with a disability to benefit from special education . . . ." *Id.* Because the District's offer to transport D.D. to Compass Academy would have allowed D.D. to benefit from special education at Compass Academy, T.R. is not entitled to have T.R.'s transportation costs reimbursed going forward (so long as the District's offer to transport D.D. to Compass Academy still stands).

[286] Of course, the Hearing Officer did require such reimbursement. *See* Administrative R. (Doc. 14) at 2576. Given this, T.R. had a right to expect reimbursement for transportation costs until and unless the Administrative Decision was reversed in this regard. *Cf. L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 903 (9th Cir. 2009) ("Where the agency or the court has ruled on the appropriateness of the educational placement in the parents' favor, the school district is responsible for appropriate private education costs regardless of the outcome of an appeal."). The Court thus concludes that the most appropriate relief to fashion here is to declare this part of the Hearing Officer's decision incorrect, but not to require T.R. to pay the District back for any transportation costs that the District has already distributed to T.R. *See* 20 U.S.C. § 1415(i)(2)(c)(iii) (A court "shall grant such relief as the court determines is appropriate."); *Cf. District of Columbia v. Jeppsen ex rel. M.J.*, 468 F. Supp. 2d 107, 112 (D.D.C. 2006) ("[T]he effect of requiring parents to reimburse school districts would be to discourage parent[s] with limited financial resources from taking advantage of the stay-put provision and that such an effect would undermine the IDEA's fundamental policy goals." (quotation marks and citation omitted)).

[287] T.R. argues broadly that this Court lacks subject matter jurisdiction over the District's Counterclaim because the Court is not able to redress the District's injury with a favorable decision. Br. in Supp. of Pl.'s Mot. for J. on the R. (Doc. 18) at 2. And it is true that all of the relief ordered by the Hearing Officer in the two Administrative Decisions has been fully implemented. *See* Administrative R. (Doc. 14) at 152–54, 2576. That is, the District has already paid for tuition (and related expenses) at Compass Academy for the 2022–2023 and 2023–2024 school years. And the

IDEA's stay-put provision does not permit the District to recover that money even if it prevails at a subsequent proceeding. *See Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 386 F.3d 158, 163 (2d Cir. 2004) ("[O]nce the parents' challenge to a proposed IEP succeeds . . . , consent to the private placement is implied by law, and the requirements of § 1415(j) become the responsibility of the school district." (quotation marks and citation omitted)); *L.M.*, 556 F.3d at 903 ("Where the agency or the court has ruled on the appropriateness of the educational placement in the parents' favor, the school district is responsible for appropriate private education costs regardless of the outcome of an appeal."); *Jeppsen ex rel. M.J.*, 468 F. Supp. 2d at 112 ("[R]equiring parents to reimburse school districts for tuition and other expenses paid to private schools under the stay-put provision is wholly inconsistent with the intent and spirit of the provision itself.").

Typically, the Court's inability to provide effective relief would require the dismissal of the District's Counterclaim as moot. *See Minn. Humane Soc'y v. Clark*, 184 F.3d 795, 797 (8th Cir. 1999). But there is a well-known exception to the mootness doctrine "where the challenged conduct is 'capable of repetition, yet evad[es] review.'" *Id.* (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). This exception allows a Court to hear an otherwise moot case when "(1) the challenged action is of too short a duration to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* Actions under the IDEA frequently fall under this exception because: (1) "[j]udicial review invariably takes more than nine months to complete, not to mention the time consumed during the preceding state administrative hearings," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 186 n.9 (1982); and (2) "conflict over placement will likely recur every school year," *Bentonville Sch. Dist. v. Smith*, No. 5:17-cv-05134, 2018 WL 11541109, at *2 (W.D. Ark. Apr. 10, 2018).

Nearly all of the issues in this case fall into the capable-of-repetition-yet-evading-review exception to mootness. T.R.'s principal argument to the contrary is that the District did not do all it could to prevent the case from becoming moot. *See* Br. in Supp. of Pl.'s Mot. for J. on the R. (Doc. 18) at 4–6. That is, T.R. focuses on the fact that the District did not file for a stay of the Hearing Officer's 2022–2023 and 2023–2024 payment orders. *See id.* But doing so would have been futile. Under the IDEA, once a Hearing Officer makes a decision regarding placement, that decision operates as a binding placement agreement between the parties for purposes of the IDEA's stay put provision. *See* 34 C.F.R. § 300.518(d) (If the hearing officer agrees with the parents' decision that the change of placement was appropriate, then the new placement "must be treated as an agreement between the State and the parents for purposes of paragraph (a) of [34 C.F.R. § 300.518]."); *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982) ("The statute substitutes an absolute rule in favor of the status quo for the court's discretionary consideration . . . ."). The Court thus does not have the authority to stay the placement or payment order. *See Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996) ("Once a court ascertains the student's current educational placement, the movants are entitled to an order without satisfaction of the usual prerequisites to injunctive relief.").

One issue—whether the District's allegedly deficient implementation of the 2021–2022 IEPs amounted to a procedural and substantive violation of the IDEA—does not fit into the capable-of-repetition-yet-evading-review exception to mootness. The District's specific alleged conduct underlying this decision is not likely to occur again. So it is not "reasonably foreseeable that [this] particular issue will be likely to repeat." *Roberts v. Norris*, 415 F.3d 816, 819 (8th Cir. 2005) (quotation marks and citation omitted). D.D. does not currently attend Vilonia High School, and it is unclear whether D.D. would attend Vilonia High School should the District receive a verdict in its favor. Administrative R. (Doc. 14) at 366. D.D.'s IEP was changed and amended several times during the 2021–2022 school year. *See id.* at 1390–1406, 2104–25, 2127–42, 2259–77, 2341–58. It is not clear what IEPs for future school years would look like and whether the implementation of those IEPs would present the same issues presented by the IEPs from the 2021–2022 school year. Perhaps most importantly, there have been very relevant staffing changes to Vilonia High School's special education team since the 2021–2022 year. Recall that, in 2021, Mr. Renuard—D.D.'s special education teacher—was inexperienced. The 2021–2022 school year was his first year as a teacher. *Id.* at 411. The Hearing Officer described D.D.'s 2021–2022 school year as "lack[ing] structure and appropriate instruction." *Id.* at 146. Should D.D. return to Vilonia High School, Mr. Renuard would not be D.D.'s teacher. Instead, Jeannie Noel, D.D.'s teacher for 7th and 8th grade, would be D.D.'s teacher going forward. *See id.* at 2689. It is not likely that the problems that arose with the inexperienced Mr. Renuard would again arise under the tutelage of Ms. Noel. So, any likelihood of this issue recurring is speculative. *See McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1211 (8th Cir. 1992) ("A mere physical or theoretical possibility is insufficient[.]" (quotation marks and citation omitted)).

based on the District's alleged unilateral unenrollment of D.D. in April of 2022 and subsequent failure to develop a new IEP/provide a FAPE, the Court agrees with the Hearing Officer's conclusion—as a *de novo* matter—for the reasons set out by the Hearing Officer.[288]

All this leaves one non-merits issue to resolve.[289] At the September 12, 2024 hearing, the Court expressed some concerns regarding the deadline to bring a civil action challenging an Administrative Decision under the IDEA.[290] Understanding that concern requires consideration of the following timeline. The First Administrative Decision was issued on June 25, 2023.[291] The District timely filed an appeal of that decision in state court on September 15, 2023.[292] The Second Administrative Decision was issued on October 5, 2023.[293] That gave the District until January 3, 2024, to file a timely appeal.[294] But, for the reasons discussed below, that did not happen.

On December 15, 2023, T.R. filed the operative Complaint in the instant case to recoup attorneys' fees and costs expended in the two administrative proceedings.[295] After the Complaint was filed, the District contacted T.R., and the parties agreed between themselves that the District could appeal both Administrative Decisions in federal court if the District included a Counterclaim

---

[288] *See* Administrative R. (Doc. 14) at 138–42.

[289] There is one additional minor substantive issue worth mentioning at this time. The District argues that, because D.D. "[l]eft the District" before the filing of the Second Due Process Complaint, all claims in the Second Due Process Complaint are barred. *See* Br. in Supp. of Def.'s Mot. for J. on the R. (Doc. 16) at 17; see *also D.L. by Landon v. St. Louis City Sch. Dist.*, 950 F.3d 1057, 1063 (8th Cir. 2020). As noted above, however, the Court concludes that D.D. was unenrolled by the District and then the District agreed to place D.D. at Compass Academy. In that situation, a due process complaint is not barred. *See* 20 U.S.C. § 1412(a)(10)(C)(iii); *Blount Cnty. Bd. of Educ. v. Bowens*, 762 F.3d 1242, 1247 (11th Cir. 2014) ("Because the Board approved or, at the very least, acquiesced in the placement of [the student] at [the private school], the [notice requirement for] reimbursement for a unilateral placement does not apply to this appeal.").

[290] Sept. 12, 2024 Hr'g Tr. (rough) at 11:27:28–11:28:30.

[291] Administrative R. (Doc. 14) at 121–55.

[292] Ex. 1 (State Court Complaint) to Sept. 11, 2024 Notice (Doc. 21-1).

[293] Administrative R. (Doc. 14) at 2551–77.

[294] *See* 20 U.S.C. § 1415(i)(2)(B).

[295] Compl. (Doc. 1).

in its Answer.[296] The Answer was due on January 5, 2024.[297] The District filed its Answer—which contained its Counterclaim—on January 4, 2024, one day after the statutory deadline to file an appeal of the Second Administrative Decision.[298] The District subsequently dropped the state court appeal.[299]

T.R. admits that T.R. waived all objections to the timeliness of the District's two appeals by agreeing to allow the District to file such appeals by January 5, 2024.[300] But can the statutory deadline be waived? If the statutory deadline is jurisdictional, the answer is no.[301] If the statutory deadline is instead a claim-processing rule, the answer is yes.[302]

According to the Supreme Court, "most time bars are nonjurisdictional."[303] In order to determine whether a limitations deadline is a nonwaivable jurisdictional bar or a waivable claim-processing rule, courts look to the plain meaning of the provision's language.[304] But the Supreme Court has—rightly or wrongly—put a thumb on the scale in favor of time bars being

---

[296] Ex. 3 (Emails Between Parties) to Sept. 11, 2024 Notice (Doc. 21-3).

[297] *See* Fed. R. Civ. P. 12(a)(1)(A)(i).

[298] Answer (Doc. 6).

[299] Ex. 2 (State Court Docket) to Sept. 11, 2024 Notice (Doc. 21-2).

[300] Pl.'s Br. Regarding Jurisdiction (Doc. 23) at 3.

[301] *See McIntosh v. United States*, 601 U.S. 330, 337 (2024). Moreover, if the statute of limitations issue is jurisdictional, then it would not matter that neither party raised this concern in their briefing on the Motions for Judgment on the Record. That is because the Court has an individual responsibility to ensure that it has subject matter jurisdiction over the case. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

[302] *See McIntosh*, 601 U.S. at 337 ("[M]andatory claim-processing rules are subject to waiver and forfeiture by a litigant.").

[303] *United States v. Wong*, 575 U.S. 402, 410 (2015).

[304] *Artis v. District of Columbia*, 583 U.S. 71, 83 n.8 (2018) ("[C]ourts must give effect to the clear meaning of statutes as written, . . . giving each word its ordinary, contemporary, common meaning." (quotation marks and citation omitted)).

considered claim-processing rules.[305] If the statute is not clear that the time bar in question is jurisdictional, binding precedent requires courts to treat the time bar as a claim-processing rule.[306]

The IDEA's statutory deadline, which can be found at 20 U.S.C. § 1415(i)(2)(B), reads as follows: "The party bringing the action shall have 90 days from the date of the decision of the hearing officer to bring such an action, or, if the State has an explicit time limitation for bringing such action under this subchapter, in such time as the State law allows." There are at least five clues to suggest that this time bar provision is not a jurisdictional one.

The first clue that the time bar provision is not a jurisdictional one is that the subsection is titled "Limitations" as opposed to "Jurisdiction." The second clue that the time bar provision is not a jurisdictional one is that the subsection is nested in a section titled "Right to [B]ring [C]ivil [A]ction" as opposed to the neighboring section titled (in part) "Jurisdiction of [D]istrict [C]ourts[.]"[307] Generally, the existence of a private right of action is not a jurisdictional question.[308] And Congress could have nested the "Limitations" subsection in the "Jurisdiction of [D]istrict [C]ourts" section if it wanted to do so.

The third clue that the time bar provision is not a jurisdictional one is that the provision does not use the term jurisdiction or a synonym for jurisdiction.[309] This omission is of additional import when one considers the obviously jurisdictional language in the "Jurisdiction of [D]istrict [C]ourts" section: "The district courts of the United States shall have jurisdiction of actions

---

[305] *See Wong*, 575 U.S. at 409–10.

[306] *See id.*

[307] *See* 20 U.S.C. §§ 1415(i)(2), 1415(i)(3). *See also Miller v. N.J. State Dep't of Corr.*, 145 F.3d 616, 618 (3d Cir. 1998) (concluding a time bar was not jurisdictional, in part, because the statute "affirmatively separate[d] the time limitation provision from the section that deals with jurisdiction").

[308] *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1217 (8th Cir. 2023).

[309] *See Miller*, 145 F.3d at 618 (concluding a time bar was not jurisdictional, in part, because the statute "[did] not use the term 'jurisdiction'").

brought under this section without regard to the amount in controversy."[310]  The fourth clue that the time bar provision is not a jurisdictional one is that the provision speaks in terms of the time a party has to do something as opposed to speaking in terms of any implications with respect to the Court's power.  Lastly, the fifth clue that the time bar provision is not a jurisdictional one is that the provision allows a state to limit or expand the 90-day default deadline.  It would be odd indeed to give states the power to decide a federal court's jurisdiction to hear a case.[311]

In short, both the language and structure of the IDEA suggest the time bar is not jurisdictional.  So, it is unsurprising that the vast majority of district courts to have addressed this question have found that the IDEA's time bar is not jurisdictional.[312]  T.R.'s arguments to the contrary are unpersuasive, especially in light of the close-to-clear-statement rule set out in binding Supreme Court precedent.[313]  The time bar is a claim-processing rule and, as such, has been waived in this case.

## CONCLUSION

For the reasons set out above, the Court GRANTS IN PART and DENIES IN PART the District's Motion for Judgment on the Record and T.R.'s Motion for Judgment on the Record.[314]  The District is granted Judgment on the Record only to the extent that the Court reverses the Hearing Officer's decision requiring the District to pay T.R. for transportation costs arising from

---

[310] 20 U.S.C. § 1415(i)(3)(A).

[311] *Cf. Bowles v. Russell*, 551 U.S. 205, 211 (2007) ("[O]nly Congress may determine a lower court's subject-matter jurisdiction." (quotation marks and citation omitted)).

[312] *See Wall Twp. Bd. of Educ. v. C.M.*, 534 F. Supp. 2d 487, 492 (D.N.J. 2008); *B.R. v. Prosser Sch. Dist. No. 116*, No. CV-08-5025-RHW, 2010 WL 723782, at *2 (E.D. Wash. Feb. 26, 2010); *Ogden ex rel. Ogden v. Granite Sch. Dist.*, No. 2:22-cv-00331, 2023 WL 2665719, at *4 (D. Utah Mar. 28, 2023).  *But see C.B v. Argyle Indep. Sch. Dist.*, No. 4:11cv619, 2012 WL 695834, at *5 (E.D. Tex. Feb. 7, 2012).

[313] *See Wong*, 575 U.S. at 409–10.

[314] Def.'s Mot. for J. on the R. (Doc. 15); Pl.'s Mot. for J. on the R. (Doc. 17).

D.D.'s attendance at Compass Academy in the 2022–2023 and 2023–2024 school years.[315]  T.R. is granted Judgment on the Record as to everything else.[316]

The practical upshot of all this would seem to be that the District is going to be required to pay for D.D.'s attendance at Compass Academy over the next few years—including a one-on-one paraprofessional, but not necessarily including transportation costs—unless and until the District develops an IEP that moves D.D. back to the District (or to somewhere other than Compass Academy) and goes through the necessary process of obtaining parental consent or proceeding without parental consent.   The latter obviously involves the prospect of an additional administrative process and then maybe more litigation.  And, as the Court understands it, D.D. would remain at Compass Academy during the pendency of that additional administrative process and litigation.[317]

IT IS SO ORDERED this 31st day of March 2025.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[315] *But see supra* note 286.

[316] *But see supra* note 269.  Finally, it is important to note that none of this addresses T.R.'s Complaint for fees and costs. Compl. (Doc. 1).  It only addresses the District's Counterclaim challenging the two Administrative Decisions. Answer (Doc. 6) ¶¶ 29–38.

[317] *See* 20 U.S.C. § 1415(j).  The District certainly has the legal right to try to proceed in this way; that is, to try and change D.D.'s placement for future years.  But having the right to do a thing is not the same as doing the right thing. The Court would encourage the District to take a long breath and really consider whether the juice is worth the squeeze here.